Filed 9/9/15 Unmodified version attached

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re the Marriage of LINDA F. and CHARLES H. BRANDES. | |
| | D062729 |
| LINDA F. BRANDES, | |
| Appellant, | (Super. Ct. No. D485527) |
| v. | ORDER MODIFYING OPINION AND DENYING LINDA BRANDES'S PETITION FOR REHEARING |
| CHARLES H. BRANDES, | |
| Appellant. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is so ordered that the opinion filed herein on August 14, 2015, be modified as follows:

On page 22, the last sentence of the first partial paragraph is removed and replaced with the following sentences:

" ' " 'In its generic sense, constructive fraud comprises all acts, omissions and concealments involving a breach of legal or equitable duty, trust, or confidence, and *resulting in damages to another*. . . .' " ' '[W]hether a fiduciary duty has been breached, and whether [conduct] constitutes constructive . . . fraud, depends on the facts and circumstances of each case.' " (*Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1131, italics added, citations omitted; Civ. Code, § 1573.)

**There is no change in the judgment.**

       Linda Brandes's petition for rehearing is denied.

McCONNELL, P. J.

Copies to:  All parties

Filed 8/14/15  Certified for Publication 8/31/15 (order attached)  Unmodified version

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of LINDA F. and CHARLES H. BRANDES. | D062729 |
| LINDA F. BRANDES, | |
| Appellant, | (Super. Ct. No. D485527) |
| v. | |
| CHARLES H. BRANDES, | |
| Appellant. | |

APPEALS from a judgment of the Superior Court of San Diego County, Jeffrey S. Bostwick, Judge.  Affirmed in part; reversed in part with directions.

Sandler, Lasry, Laube, Byer & Valdez, Edward I. Silverman; Karcher Harmes, Kathryn E. Karcher; Dick & Wagner, Stephen James Wagner; Jones Barnes, Rex L. Jones, III, Julie R. Barnes and Matthew K. Strauss for Appellant Linda F. Brandes.

Law Offices of Marjorie G. Fuller, Marjorie G. Fuller; Wasser, Cooperman & Carter, Dennis M. Wasser, Bruce E. Cooperman and Amy L. Rice for Appellant Charles H. Brandes.

In this dissolution action, Linda F. Brandes (Linda) appeals a judgment awarding Charles H. Brandes (Charles) a business he founded before the marriage, Brandes Investment Partners (BIP),[1] as his separate property, and awarding the community an equitable allocation—under the *Pereira v. Pereira* (1909) 156 Cal. 1 (*Pereira*) approach for the early period during which the growth was primarily attributable to his personal efforts, and under the *Van Camp v. Van Camp* (1921) 53 Cal.App. 17 (*Van Camp*) approach for the later period during which the growth was primarily attributable to other factors. The *Pereira* approach allocates a fair return to the separate property investment and the balance of growth to the community, and the *Van Camp* approach allocates the reasonable value of the owner spouse's services to the community and the balance of growth to separate property. (*In re Marriage of Dekker* (1993) 17 Cal.App.4th 842, 853-854 (*Dekker*).)

Under a variety of theories, Linda contends the court erred by not determining the community owns all or most of BIP. For instance, she asserts BIP became a completely new business during the marriage, and thus it lost its separate property characterization.

Additionally, Linda contends the court erred by denying her prejudgment interest on her share of the community's interest in BIP as of the end of the *Pereira* period, by

---

1    The business name and form periodically changed, but for simplicity's sake we use BIP throughout this opinion.

characterizing profit distributions BIP labeled as W-2 income as Charles's separate property, and by awarding Charles 10,000 shares of BIP stock he purchased from a third party in two transactions during the marriage. Linda claims 4,000 of the shares are community property because Charles used community funds to purchase them. She asserts the remaining 6,000 shares are presumptively community property under the lender's intent doctrine, because the purchase was financed under a promissory note entered into during the marriage, and Charles did not rebut the presumption by showing the seller relied primarily on his separate property for payment.

Charles also appeals, contending the court erred by awarding Linda $450,000 per month in spousal support. He asserts that under Family Code section 4322,[2] she is not entitled to any support because, if invested prudently, her share of the community property is sufficient to cover her actual postseparation expenses of approximately $100,000 per month. Alternatively, he asserts the support is excessive given her actual expenses.

We partially agree with Linda on the lender's intent doctrine. The doctrine applies to the percentage of the 6,000 shares purchased under the promissory note, and the court erred by not finding in accordance with the community property presumption since Charles did not rebut it. In all other respects, we disagree with Linda's theories. We decline to resolve Charles's appeal, because on remand it may become moot. The court

---

2      Further statutory references are also to the Family Code unless otherwise specified.

3

must revisit the spousal support issue, because an order is based, in part, on a spouse's separate estate (§ 4320, subd. (e)), and Linda's separate estate will likely increase.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1974, Charles founded BIP to provide investment advisory services in exchange for fees based on the percentage of clients' assets under management. Charles and Linda met in 1983, when BIP was only marginally successful. That year, BIP managed assets of $8.2 million and he had income of $44,148.

Charles and Linda each had two children from prior marriages. After dating for a few months, Charles began proposing marriage, but Linda refused "unless he could show some initiative to make enough money to support" a family of six. At Linda's request, he "changed his appearance, changed his clothes, changed his car and changed his work hours."

The parties wed in August 1986. At that time, Charles owned 90 percent of BIP. In 1985, Charles Brown, who was Charles's long-time client, purchased 10 percent of the business (10,000 shares after stock splits). BIP's managed assets were approximately $20 million on the date of marriage, and by the end of 1986 they rose to $63 million. BIP continued to grow, and Charles's income eventually afforded the parties "a very opulent lifestyle."

In June 2004, the parties separated. By then, Charles had purchased Brown's interest in BIP, and BIP's managed assets were $85 billion. The community estate was worth approximately $208 million, excluding any interest in BIP.

4

Charles petitioned for dissolution, and in August 2005 the parties stipulated to the distribution of community bank accounts and real properties. Under the stipulation, Charles was awarded homes in Rancho Santa Fe and Borrego Springs, and Linda was awarded six homes, including a penthouse on Park Avenue in New York City, a beachside home in Del Mar, and a home in Rancho Santa Fe. The unencumbered value of Linda's real properties was approximately $50 million, and her total separate estate was approximately $100 million.

In July 2005, the family court entered a judgment of dissolution as to marital status only. Unresolved financial issues were the subject of two separate trials referred to as Phase I and Phase II.

Phase I was tried in 2008 and, as is relevant here, the issue was how the community's interest in BIP should be characterized. Linda argued the community owned 100 percent of BIP because during the marriage it became a completely different business. In other words, Charles effectively "started a new business during the marriage."

Alternatively, Linda argued BIP is "virtually all" community property under either a pure *Pereira* approach, or what she called a "fixed-ratio" theory. Under the fixed-ratio theory, *Pereira* applied between the date of marriage and the date BIP's growth became attributable to factors other than Charles's personal efforts, in her view no earlier than 1995, and from that point the community had an *ownership* interest in BIP commensurate with its interest in BIP's growth at the close of the *Pereira* period.

5

Charles argued BIP retained its separate property character throughout the marriage. He also argued that since the lion's share of its growth was chiefly attributable to factors other than his personal efforts, the community's interest was limited to reasonable compensation for his services under the *Van Camp* approach.

In September 2009, the court issued a final statement of decision on Phase I. The court characterized BIP as Charles's separate property.[3] The court used a hybrid approach in allocating BIP's increased value between Charles and the community. It determined that between August 1986 and 1991, Charles's personal efforts were the primary factor in the growth, and thus the *Pereira* approach applied for that period. The evidence showed that between 1986 and 1989, Charles was the sole manager of the business; he established BIP's investing philosophy; he was the central figure in business marketing; his track record attracted investors; and he hired employees, trained them, and directed their activities. In 1987, BIP managed $107 million in assets. BIP's growth slowed somewhat between 1987 and 1990, and at the close of 1991 its managed assets were $213 million.

Between 1992 and June 2004, BIP's managed assets grew to approximately $85 billion. The court determined that during this period, the growth was chiefly attributable to factors other than Charles's personal efforts, and thus allocation under the *Van Camp*

---

3    The court, however, noted that in 1991 Charles purchased "one share of BIP" from W. Roberts Wood, and it was community property because Charles conceded "there are no records available to trace the Wood purchase." This stock is not at issue on appeal.

approach was proper. Linda's expert testified that 99.75 percent of BIP's growth occurred after 1991.

The evidence showed that Glen Carlson had become BIP's chief executive officer, and Jeff Busby its chief operating officer. They recognized "real growth potential was in institutional, not individual, markets," but BIP needed managed assets of $1 billion to compete for institutional clients. Carlson and Busby advised Charles that BIP "would only continue to moderately grow unless it could enter the asset allocation programs of large brokerage firms, the so-called WRAP programs."[4] Carlson and Busby proposed that BIP enter the WRAP market with a "pure international stock fund," which "represented a great departure from any existing fund the business offered." Busby and Carlson researched performance data for international stocks and "created a model portfolio of 35 stocks . . . ."

Initially, Charles was not receptive because the fee structure was lower on WRAP programs. Carlson and Busby persisted, and Charles eventually acquiesced. The new fund, called IEP, was launched in June 1990.

Further, Carlson and Busby urged Charles to hire Barry O'Neil, a Dean Witter manager who understood WRAP programs, to market IEP to large brokerage firms. O'Neil was hired in February 1991, and that July he convinced Dean Witter to select BIP.

---

[4] The statement of decision for Phase I explains: "A full sub-advisory wrap program is an investment method that allocates assets into classes. Each investment class of a client's portfolio is managed by an outside investment management firm. Typically the client's broker selects the outside management firm. The client pays the broker a flat fee depending on the size of the client's portfolio. The broker in turn shares the fee with each outside management firm managing each investment class of the client's portfolio."

Also in 1991, an executive committee was formed for BIP, after which management decisions were made by the committee rather than "the dictates of Charles." In addition to internal factors, after 1991 BIP's growth was driven by external factors, including bull markets and the popularity of foreign investing.

The court agreed with Charles's argument the community had already been substantially overcompensated for his services during the *Van Camp* period. Thus, the court found the community is not entitled to additional funds for that period.

After the Phase I trial, the parties stipulated that the community's interest in BIP's increase in value during the *Pereira* period was $3,600,932. In March 2011, the Phase II trial was held. The remaining issues were whether BIP profit distributions to Charles were community property because they were labeled as W-2 income; whether 10,000 shares of BIP stock Charles purchased from Brown in two installments during the marriage were community property; the correct valuation method for BIP; and Linda's request for spousal support. Further, despite the court's ruling in Phase I, Linda continued to argue the community acquired an ownership interest in BIP rather than a right of equitable allocation.

In May 2012, the court issued a final statement of decision on Phase II. The court confirmed that the community did not acquire an ownership interest in BIP, but was entitled to equitable allocation under a hybrid *Pereira/Van Camp* approach. The court also confirmed that because the family expenses exceeded the community income during the *Van Camp* period, the community was not entitled to any additional amount for that period.

The court determined BIP paid Charles approximately $643 million during the marriage, approximately $408 million as wages/bonuses and approximately $235 million as distributions of profit. According to Charles's expert, the community's share of the funds, including his reasonable compensation of $36 million, was $50 million gross, or $31 million net. The court ruled that all payments from BIP in excess of Charles's reasonable compensation were his separate property whether or not they were labeled as W-2 income.

The court rejected Linda's argument Charles purchased Brown's 10,000 shares of BIP stock with community property. It found the parties' marital expenses were approximately $150 million, thus they exceeded the community funds by $119 million, a deficit Charles funded from his separate property. Because there were no community funds available for the purchase of Brown's stock, it was necessarily purchased with Charles's separate property.

As to the valuation of BIP, the court agreed with Charles that investment value applies, rather than fair market value, because BIP is not marketable. The parties stipulated the valuation should be made as of September 30, 2010, and the investment value of Charles's interest in BIP on that date was $372,982,000.

As for spousal support, Linda claimed income of approximately $33,000 per month and living expenses of approximately $735,000 per month. She claimed expenses for her adult children, for homes she purchased for them and her mother, and for the real properties she was awarded by stipulation. The court rejected those expenses, and calculated her allowable expenses were approximately $96,000 to $98,000 per month.

9

Before the marriage Linda worked at a public library for $6.00 an hour, and during the marriage she was not employed outside the home.

Charles was earning approximately $5.6 million per month, and he agreed "he has the ability to pay reasonable spousal support." The court rejected Charles's argument support should be denied altogether, or limited to Linda's actual expenses. Based on the section 4320 factors that must be considered in setting support, "and the equities in this case," the court ordered Charles to pay Linda $450,000 per month.

The court explained Linda was taxed at a rate of 42 percent, and the ordered support and income from her estate would generate net monthly income of approximately $290,000, which would "approximate[] the amount the parties[] spent each month prior to separation" and "more closely enable[] Linda to continue to enjoy the parties' marital standard of living." The court noted that even with the support, her monthly income "will be a fraction of the monthly income available to Charles."

A judgment on reserved issues was entered on July 23, 2012. The judgment includes an order that Charles pay Linda $10,052,042 to equalize the division of community property.

DISCUSSION

I

*Community Interest in BIP*

A

"Under California's community property law, the characterization of 'property as separate, community, or quasi-community' 'is an integral part of the division of property

on marital dissolution.' [Citation.] Courts recognize several factors relevant to this task [citation], but 'the most basic characterization factor is the time when property is acquired in relation to the parties' marital status' [citation]." (*In re Marriage of Finby* (2013) 222 Cal.App.4th 977, 984.) With certain exceptions, property acquired during the marriage and before separation is presumptively community property (§ 760), and property acquired before the marriage, and "rents, issues, and profits" from such property, are presumptively separate property (§ 770, subd. (a)(1), (3)).

Courts typically apply a substantial evidence standard of review to the court's characterization of property as separate or community. (*Beam v. Bank of America* (1971) 6 Cal.3d 12, 25 (*Beam*); *In re Marriage of Mix* (1975) 14 Cal.3d 604, 613; *In re Marriage of Ruiz* (2011) 194 Cal.App.4th 348, 356, fn. 3; *Dekker, supra,* 17 Cal.App.4th at p. 849.) In that situation, "[o]ur review is limited to a determination whether there is any substantial evidence, contradicted or uncontradicted, that supports the finding. [Citations.] In so reviewing, all conflicts must be resolved in favor of [the prevailing party] and all legitimate and reasonable inferences must be indulged to uphold the finding." (*McLellan v. McLellan* (1972) 23 Cal.App.3d 343, 356.) "However, when the resolution of the issue ' "requires a critical consideration, in a factual context, of legal principles and their underlying values," ' the issue is a mixed question of law and fact in which legal issues predominate, and de novo review applies." (*In re Marriage of Ruiz,* at p. 356, fn. 3; *In re Marriage of Lehman* (1998) 18 Cal.4th 169, 184.)

When a spouse's personal efforts increase the value of his or her separate property business, "it becomes necessary to quantify the contributions of the separate capital and

11

community effort to the increase," because the "community is entitled to the increase in profits attributable to the community endeavor." (*Dekker, supra,* 17 Cal.App.4th at p. 851; *Beam, supra,* 6 Cal.3d at p. 17.) California courts have developed two alternative approaches to allocating business profits between separate and community estates. (*Dekker,* at pp. 852-853, fn. omitted.)

"*Pereira* is typically applied where business profits are principally attributed to efforts of the community." (*Dekker, supra,* 17 Cal.App.4th at p. 853.) "The *Pereira* approach is to allocate a fair return to the separate property investment and allocate the balance of the increased value to community property as arising from community efforts." (*Id.* at pp. 852-853.) In a *Pereira* allocation, the court need not "limit the community interest to a salary as reward for a spouse's efforts . . . ." (*Id.* at p. 853.) "To limit the community to compensation received by way of salary during the marriage would ignore California's egalitarian marriage model and the apportionment formula of *Pereira* . . . ." (*Id.* at p. 854.)

"Conversely, *Van Camp* is applied where community effort is more than minimally involved in a separate business, yet the business profits accrued are attributed to the character of the separate asset." (*Dekker, supra,* 17 Cal.App.4th at p. 853.) "The *Van Camp* approach is to determine the reasonable value of the community's services, allocate that amount to community property and the balance to separate property." (*Ibid.*)

" 'In making such apportionment between separate and community property our courts have developed no precise criterion or fixed standard, but have endeavored to adopt that yardstick which is most appropriate and equitable in a particular

12

situation . . . depending on whether the character of the capital investment in the separate property or the personal activity, ability, and capacity of the spouse is the chief contributing factor in the realization of income and profits [citations].' " (*Beam, supra,* 6 Cal.3d at p. 18.) The court " 'may select [whichever] formula will achieve *substantial justice* between the parties. [Citations.]' " (*Ibid.*, italics added; Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 1998) ¶ 8:347, p. 8-133 (rev. 2015) (hereafter Hogoboom & King) ["No precise standards govern the trial court's decision in choosing between *Pereira* or *Van Camp* (or, for that matter, any other equitable apportionment method).].)"

Issues pertaining to the allocation of the community's interest in a spouse's separate business are reviewed for abuse of discretion. (*In re Marriage of Lehman, supra,* 18 Cal.4th at p. 187; *Dekker, supra,* 17 Cal.App.4th at p. 853.) " ' " 'Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered. The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.' " ' [Citation.] ' "The abuse of discretion standard . . . measures whether, given the established evidence, the act of the lower tribunal falls within the permissible range of options set by the legal criteria." ' [Citation.] As long as there is a reasonable or even fairly debatable justification for the ruling, we will not set it aside." (*Hahn v. Diaz-Barba* (2011) 194 Cal.App.4th 1177, 1195.)

13

B

Linda does not challenge any of the court's factual findings, "only the court's application of law to the findings." Her principal contention is that the community has a 100 percent ownership interest in BIP because during the marriage it became a completely different business and lost its separate property character. In support, Linda relies on *Mueller v. Mueller* (1956) 144 Cal.App.2d 245 (*Mueller*), but that opinion is readily distinguishable.

In *Mueller,* the husband purchased a dental laboratory for $6,500 nine years before the marriage. He testified that at the time of marriage, his entire assets totaled $7,000, and thus any business growth had been minimal. (*Mueller, supra,* 144 Cal.App.2d at p. 247.) The wife, who also worked in the business during the marriage, argued the business was a community asset under commingling principles. (*Id.* at pp. 247, 249.)

"Generally, 'commingling' is a word of art, used to connote the mixture of separate property or funds with community property or funds." (*In re Marriage of Devlin* (1982) 138 Cal.App.3d 804, 810.) "It is a familiar rule that separate property may become community property by the process of commingling in such a manner as to make segregation impossible, thus requiring the application of the presumption that it is community property." (*Pack v. Vartanian* (1965) 232 Cal.App.2d 466, 472.) For instance, the proceeds of an insurance policy on the life of a spouse are community property to the extent premiums were paid with community funds. (*Polk v. Polk* (1964) 228 Cal.App.2d 763, 781.) Further, the community has an interest in separate real property to the extent it was paid for or improved with community funds. (*Patrick v.*

14

*Alacer Corp.* (2011) 201 Cal.App.4th 1326, 1344 (*Alacer*).) "The need for specific records and documents to trace funds is . . . predicated on the existence of a commingled account." (*In re Marriage of Ficke* (2013) 217 Cal.App.4th 10, 25.)

Under a substantial evidence analysis, *Mueller* affirmed the trial court's finding the business was community property. (*Mueller, supra,* 144 Cal.App.2d at p. 250.) Linda relies on these comments from *Mueller*: "During the marriage the size of the business increased greatly," the "income from the business also increased tremendously" (*id.* at p. 247), and "the location of the business was changed after marriage and . . . new furniture, fixtures and equipment were added." (*Id.* at p. 250.) She asserts *Mueller* is analogous, since during the marriage the size and income of BIP increased substantially. For instance, the business relocated from "five small offices to more than 100,000 square feet on five floors," the number of employees went from five to 514, managed assets increased from $20 million to $85.7 billion, and revenue increased from $572,000 to $475 million.

*Mueller*, however, does not suggest that standing alone, substantial growth of a business during marriage causes it to lose its separate property character. Rather, the characterization of the business in *Mueller* as community property was based on the husband's failure to overcome the presumption of community property based on commingling. (*Mueller, supra,* 144 Cal.App.2d at p. 250.) *Mueller* held: "In the *absence of any evidence in the record to trace any of the property that was in the business at the time of the marriage*, and in view of the manner in which the proceeds of the business were invested and regarded by [the parties], the court may well have

15

concluded that any portion of the present value of the dental laboratory business that could be said to be traceable back to original investment was so intermingled with undisputed community property that it should be regarded as community property." (*Ibid.*, italics added.)

Linda asserts that without evidence to the contrary, we must assume BIP's "chairs, file cabinets, desks, stock ledger books and other hard assets that BIP owned as of the date of the marriage were long since upgraded and replaced and no longer existed." She also claims the amount of BIP's assets under management on the date of marriage does not establish the value of Charles's separate property interest at that time, because "the assets belonged to the 300 private investors, not to BIP." Linda, however, ignores that in preparation for the Phase II trial, the parties *stipulated* that on the date of marriage BIP was worth $700,000, and Charles's 90 percent ownership was worth $630,000. Unlike the situation in *Mueller,* there was no presumption BIP was community property because of commingling. Because of the parties' stipulation, Charles was not required to trace the value of his separate property interest in BIP at the time of marriage.[5]

The court rejected Linda's argument "the post-marriage BIP is a new business because it so radically changed over the years." The court's statement of decision for

---

[5]    Linda's reliance on *In re Marriage of Lopez* (1974) 38 Cal.App.3d 93, disapproved of on another ground in *In re Marriage of Morrison* (1978) 20 Cal.3d 437, 453, is likewise misplaced. *Lopez* involved the husband's law business. It discusses the *Pereira* and *Van Camp* allocation approaches, and citing *Mueller,* notes that on remand "the trial court might well conclude that husband's initial investment in his law practice became so commingled with the community that all traces and vestiges of it as separate property have been lost." (*In re Marriage of Lopez,* at p. 107.)

16

Phase I explains:  "No expert testified BIP had become a completely different business.

Rather, [Kevin Patrick] Quirk[6] clarified his earlier testimony to this effect.  Quirk

stated he meant BIP had become a more successful and bigger business.  [Citation.]  BIP

never changed its mission.  Throughout the marriage, BIP provided 'investment advisory

services.'  The method of compensation did not change:  '[A] fee based on a percentage of

assets under management.'  [Citation.]  BIP's only fundamental changes were its size and

success.  BIP's growth/success necessitated changes in management, personnel,

marketing, even legal structure.  In the end, however, BIP remained the same business,

only bigger and more successful. . . .  Growth cannot and does not alone cause a complete

transmutation of the character of a business."

Linda does not challenge the sufficiency of the evidence to support the court's

factual findings.  Whether we apply a substantial evidence standard of review, or as she

urges a de novo standard, we agree with the court's determination that BIP did not lose its

separate property character by substantially growing in size and revenue during the

marriage.  Linda cites no authority to support a contrary finding.

C

1

The parties stipulated that at the close of the *Pereira* period, the community's

interest in BIP's growth was approximately $3.6 million, or 80 percent of the business's

value.  Linda contends that since the $3.6 million was not distributed to the community

6      Quirk, a management consultant to investment management firms, was one of
Charles's expert witnesses.

17

by the close of the *Pereira* period, December 31, 1991, that sum was commingled with Charles's separate property business, and the community now owns 80 percent of BIP. We disagree.

In *Alacer,* the court rejected a similar contention. *Alacer* was a shareholder derivative/declaratory relief action against the deceased husband's corporation, in which the wife sought to establish the community's ownership of the business. The wife asserted it became community property under commingling principles, in that the husband's "community efforts were 'reinvested' in [the business] against her will." (*Alacer, supra,* 201 Cal.App.4th at p. 1343.) In concluding otherwise, the court explained: "On our best reading of [the wife]'s briefs, this [supposed commingling] occurred when [the husband]'s efforts were not apportioned to the community as he made them. But California law does not require apportionment of community efforts devoted to separate property on an ongoing basis, upon pain of transmuting that separate property into community property. Courts account for community efforts toward separate property through equitable apportionment after the marriage, not transmutation during the marriage." (*Id.* at pp. 1343-1344, citing *Dekker, supra,* 17 Cal.App.4th at pp. 852-853.) *Alacer* approved of the trial court's use of *Pereira* in allocating the community's equitable interest in the business's growth. (*Alacer,* at pp. 1339, 1341.)

Linda contends *Alacer* was incorrectly decided. She asserts "the problem with [*Alacer*] . . . is that the opinion does not mention, let alone analyze and apply the existing equitable apportionment precedent" set forth in cases such as *In re Marriage of Moore* (1980) 28 Cal.3d 366 (*Moore*) and *In re Marriage of Marsden* (1982) 130 Cal.App.3d

18

426 (*Marsden*). "Generally, '[w]hen community property is used to reduce the principal balance of a mortgage on one spouse's separate property, the community acquires a pro tanto interest in the property. [Citations.] This well-established principle is known as "the *Moore/Marsden* rule." ' " (*In re Marriage of Nelson* (2006) 139 Cal.App.4th 1546, 1552.)

*Alacer,* however, does cite and consider the *Moore/Marsden* rule. In *Alacer*, the wife alternatively asserted the community was entitled to a "pro tanto interest" in the husband's business. (*Alacer, supra,* 201 Cal.App.4th at p. 1344.) The court noted she "relies on case law giving the community a pro tanto interest in separate property—real property, typically—purchased, paid down, or improved with community *funds*," citing *Moore* and *Marsden*. (*Alacer,* at p. 1344, italics added.) *Alacer* held: "[U]sing the *Moore/Marsden* approach here would conflict with the prevailing approach used when a separate property business is improved by the devotion of community efforts−equitable apportionment using *Pereira* or *Van Camp*. [Citation.] The [trial] court did not err by declining to extend the *Moore/Marsden* approach to this set of facts." (*Ibid.*)

We agree with *Alacer* and conclude it controls here. It is well established that the community's interest in a spouse's separate business is confined to equitable allocation based on the extent to which the spouse's personal efforts resulted in increased value during the marriage. (*Beam, supra,* 6 Cal.3d at pp. 18-20, favorably citing allocation approaches of *Pereira, supra,* 156 Cal. 1, and *Van Camp, supra,* 53 Cal.App. 17.) Linda presents no cogent argument for the application of the *Moore/Marsden* rule pertaining to the use of community *funds* to improve separate property. She concedes "that no case

19

has held that the investment of community efforts should be treated the same as the investment of community funds."

## 2

Additionally, Linda contends the court's hybrid *Pereira/Van Camp* approach did not achieve " 'substantial justice' " between the parties, as required by *Beam, supra,* 6 Cal.3d at pages 19-20. She states: "[T]he court did not properly apply established precedent, because there has never been a reported decision in which the court has used a hybrid formula. Rather, . . . unlike all other *Van Camp* applications, the asset here was not 100 percent separate property on the first day of the *Van Camp* period [January 1, 1992]; on that day, the asset already had an 80 percent community interest. Thus, a proper application of equitable apportionment law should have resulted in the community receiving, after 1991, its pro tanto share of the rents, issues and profits resulting from the community's application of its skills, efforts and talents through the date of valuation."

Linda continues to conflate issues of ownership and equitable allocation. Until the community interest under *Pereira* was calculated at the time of dissolution, it was merely theoretical; it was not in the nature of a capital contribution made by the community to BIP as of the end of the *Pereira* period. *Alacer, supra,* 201 Cal.App.4th at page 1344, confirms that absent the commingling of separate and community funds, which is not an issue here, the community does not obtain an *ownership* interest in a spouse's separate business. We conclude that rule of law applies whether the court uses *Pereira, Van Camp,* or, as here, some hybrid thereof.

20

We are satisfied that the court's application of a hybrid *Pereira/Van Camp* approach achieves substantial justice between the parties. Linda does not challenge the court's factual findings that Charles's efforts were the primary reason for BIP's growth between the date of marriage and 1991, and from 1992 on other factors were the primary reason for the growth. The court noted that Linda sought an astounding windfall for the community, amounting to approximately 90 percent of BIP's growth after 1992, when her own expert testified 99.75 percent of the growth during that period was primarily attributable to factors other than Charles's personal efforts. Indeed, had the court applied a single allocation approach throughout the marriage, it likely would have been the *Van Camp* approach, under which the community would have fared less favorably. The court's approach was not an abuse of discretion. Rather, it was considered and fair.

D

Additionally, Linda contends that "[w]hen Charles contributed his community efforts to his separate business, he breached [his fiduciary duty to the community], which arose from the confidential relationship enjoyed by spouses." She asserts that the breach constituted constructive fraud, which entitles the community to restitution in the form of ownership of BIP.

Spouses, of course, have fiduciary duties to each other in the management and control of community assets. (§§ 721, subd. (b), 1100, subd. (e).) "Constructive fraud allows conduct insufficient to constitute actual fraud to be treated as such where the parties stand in a fiduciary relationship. The difference between actual fraud and constructive fraud is primarily in the type of *conduct* which may be treated as fraudulent,

21

such as a failure to disclose material facts within the knowledge of the fiduciary." (*Estate of Gump* (1991) 1 Cal.App.4th 582, 601.) "The elements of the cause of action for constructive fraud are: (1) fiduciary relationship; (2) nondisclosure (breach of fiduciary duty); (3) intent to deceive, and (4) reliance and resulting injury (causation)." (*Younan v. Equifax Inc.* (1980) 111 Cal.App.3d 498, 517, fn. 14.)

The opinions Linda cites in support of this theory are unavailing. In *Vai v. Bank of America National Trust & Savings Ass'n* (1961) 56 Cal.2d 329, the wife argued she signed a settlement agreement based on the husband's misrepresentation and concealment of the value of community property. The appellate court concluded the trial court erred by finding there was no fiduciary relationship between the parties during negotiations, and the "facts as found by the trial court show the existence of a fiduciary relationship and constructive fraud as a matter of law." (*Id.* at p. 342.) *Weinberg v. Weinberg* (1967) 67 Cal.2d 557, held the community was entitled to reimbursement when the husband used community funds to discharge separate debts. (*Id.* at pp. 563-564.) Neither of these opinions is relevant here.

Linda also cites this language from *In re Marriage of Frick* (1986) 181 Cal.App.3d 997, 1020: "[I]f one spouse acts in his or her self-interest *to the detriment of the community interest*, the community should be entitled to restitution." (Italics added.) In *Frick,* the husband used community funds to reduce the principal on commercial property he owned before the marriage. *Frick* notes that " '[w]here community funds are used to make payments on property purchased by one of the spouses before marriage "the rule developed through decisions in California gives the community a pro tanto

22

community property interest in such property in the ratio that the payments on the purchase price with community funds bear to the payments made with separate funds" ' " (*Id.* at p. 1008, quoting *Moore, supra,* 28 Cal.3d at p. 371, and citing *Marsden, supra,* 130 Cal.App.3d at pp. 436-437.)

Again, however, the *Moore/Marsden* rule is inapplicable to a spouse's expenditure of personal *efforts* on his or her separate business. (*Alacer, supra,* 201 Cal.App.4th at p. 1344.) Without citing any supporting authority, Linda boldly asserts that "when a spouse uses community funds *or efforts* for the benefit of his or her separate estate a breach of a fiduciary duty occurs."

Additionally, there was nothing furtive or self-serving about Charles's conduct. It was no secret he devoted his personal efforts to BIP during the marriage. Linda agreed to this; indeed, she refused to marry him until she was satisfied he could achieve greater monetary success in the business by, among other things, putting in longer hours. She cannot reasonably claim he cheated the community by acquiescing to her demand. Further, it is absurd to claim his conduct was detrimental to the community. BIP's extraordinary success allowed the parties to have an opulent marital lifestyle and amass a fortune in real estate and other holdings, which greatly benefited Linda during and after the marriage. As the court noted, "Linda presented no persuasive evidence that she complained or was unhappy about BIP's success or the wealth she obtained therefrom."

23

*Distributions of BIP Profit*

Additionally, Linda assigns error to the court's finding that profit distributions made during the marriage are Charles's separate property even though they were designated as W-2 income. Linda conceded that the payments in question "were actually BIP profits." She argued it would be "wrong" for Charles to claim the payments as separate property under an unclean hands theory.

The court, however, determined Charles was not guilty of any wrongdoing. The court explained: "Until 2003, BIP paid Charles'[s] share of its profits to him as W-2 income. Gary Iwamura, BIP's director of finance, testified that Charles'[s] outside accountants, Ernst and Young, structured these payments as W-2 income to avoid tax liability to Charles Brown, a minority shareholder of BIP, based on 'phantom income.' [Citations.] Charles and Glen Carlson concurred with Iwamura's testimony." It further found: " . . . Charles did not create the plan to reclassify profits as W-2 income. His accountants, Ernst & Young, created the plan. [Citation.] The plan was not developed to benefit Charles. Ernst & Young developed the plan to enable Brown to avoid tax on monies he did not receive and was not entitled to receive. [Citation.] Linda's expert, Brian Brinig, testified he did not know of any other way to distribute Charles'[s] partnership profits without creating tax on phantom income for Brown. [Citation.] Therefore, Brown, not Charles, benefited from the plan."

The court also explained there "is no evidence Charles or anyone involved with this plan has been investigated for or charged with a crime pertaining to this plan. There

24

is no evidence the plan violates any accepted accounting principles, regulations or laws. In short, Linda has not provided sufficient evidence that this plan or 'mechanism' to reclassify profits as W-2 wages violates any law or constitutes wrongdoing that would support an unclean hands argument."

Linda does not challenge any of these factual findings. Rather, she ignores them. She claims the court's "ruling, is without legal precedent and . . . should violate public policy." However, she cites no supporting authority and develops no particular argument. " 'Appellate briefs must provide argument and legal authority for the positions taken. "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." ' [Citation.] 'We are not bound to develop appellants' arguments for them.' " (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.) We deem the argument waived.

## III

### *Purchase of Brown's Stock*

### A

Additionally, Linda contends the court erred by awarding Charles the 10,000 shares of BIP stock he purchased from Brown. In 1985, before the marriage, Brown, a client of BIP, purchased 10 percent of the business, which after stock splits gave him 10,000 shares of stock. That year, he and Charles entered into a shareholder agreement that gave Charles the option to purchase any or all of Brown's shares after April 1, 1990. The agreement included a formula for the purchase price, and called for a minimum down payment of 20 percent and a promissory note to cover the balance.

In 1994, Charles exercised the option for 4,000 shares at a price of $240,000. He signed an unsecured promissory note. He made all payments from the parties' joint accounts with funds designated as W-2 income. The stock purchase agreement provided that the 1985 shareholder agreement would be superseded by a new 1994 shareholder agreement "with respect to the 6,000 shares still owned by Brown."

In 1996, Charles and Brown entered into another shareholder agreement, which restated and amended the 1994 shareholder agreement.[7] The new agreement gave Charles the option of purchasing the shares after the 10th anniversary of the agreement. It included a formula for the purchase price, and called for a minimum down payment of 25 percent and a promissory note to cover the balance. It provided that the security for the note would be the shares themselves.

In 2002, Busby asked Brown to sell his remaining 6,000 shares of stock to Charles, and Brown agreed even though the 10-year period had not run. It appears that Charles made a down payment of $4,667,147.[8] A promissory note in the amount of $18,668,588.80 was signed by Charles individually, and by Charles and Linda as trustees

[7]     The 1994 shareholder agreement does not appear to be included in the appellate record.

[8]     Trial exhibit No. 177 lists payments on the 6,000 shares as follows: January 2, 2003, $4,667,147; June 5, 2003, $7,000,000; July 28, 2003, $6,000,000; and January 2, 2004, $6,212,575.

26

and beneficiaries of a family trust.[9]  He made the down payment with funds labeled as W-2 income, and note payments from a combination of funds labeled as W-2 income and profit distributions apparently not labeled as W-2 income.  The payments came from the parties' joint accounts.

As to the 4,000 shares, Linda concedes the court correctly applied the inception of title doctrine since Charles's option to purchase the shares arose before the marriage.  (*In re Marriage of Joaquin* (1987) 193 Cal.App.3d 1529, 1533 [optionee's title is acquired when option is originally given].)  She complains, however, that "the court failed to consider the source of the funds that Charles used in purchasing the 4,000 shares."  She points out that Charles deposited all BIP funds he received in the parties' joint accounts, and he withdrew funds from those accounts to purchase the Brown stock.  She asserts that "as a matter of law, because the funds withdrawn from the joint accounts were community property, community—not separate—property was used to purchase the Brown shares."

Linda relies on section 2581, which provides:  "[P]roperty acquired by the parties during marriage in joint form, including property held in tenancy in common, joint tenancy, or tenancy by the entirety, or as community property, is presumed to be community property.  This presumption is a presumption affecting the burden of proof and may be rebutted by either of the following:  [¶]  (a) A clear statement in the deed or

---

[9]    The fact that Linda signed the promissory note, without more, "does not compel a finding in favor of the community."  (*In re Marriage of Grinius* (1985) 166 Cal.App.3d 1179, 1188 (*Grinius*).)

27

other documentary evidence of title by which the property is acquired that the property is separate property and not community property.  [¶]  (b) Proof that the parties have made a written agreement that the property is separate property."

However, section 2581 is inapplicable because there is a more specific statute pertaining to joint accounts.  (Hogoboom & King, *supra,* ¶ 8:384, p. 8-139; *Blumberg v. Minthorne* (2015) 233 Cal.App.4th 1384, 1392 ["under general rules of statutory construction, more specific statutes prevail over more general ones"].)  Probate Code section 5305 provides:  "(a) . . . [I]f parties to an account are married to each other, . . . their net contribution to the account is presumed to be and remain their community property.  [¶]  (b) *Notwithstanding Sections 2581* and 2640 of the Family Code, the presumption established by this section is a presumption affecting the burden of proof and may be rebutted by proof of either of the following:  [¶]  (1) The sums on deposit that are claimed to be separate property *can be traced from separate property* unless it is proved that the married persons made a written agreement that expressed their clear intent that the sums be their community property.  [¶]  (2) The married persons made a written agreement, separate from the deposit agreement, that expressly provided that the sums on deposit, claimed not to be community property, were not to be community property."  (Italics added.)

Charles adduced evidence rebutting the community property presumption pertaining to the joint accounts.  The court explained, "Since Charles has traced those funds to a separate property source, those funds do not lose their separate property character."  Additionally, the court stated:  "Community property did not purchase any of

28

the Brown stock because there were no community funds available. Charles's forensic accountant, David Swain, testified [that] between January 1, 1994 and June 30, 2004, the total 'inflows' to the community" from BIP and other minor sources were approximately $50 million, or $31 million net, and for the same period the community spent approximately $151 million. Thus, community expenses exceeded income by approximately $119 million, and Charles necessarily purchased the stock with his personal funds.

"Either of two tracing methods may be utilized to characterize the disputed property interests: 'direct tracing,' or 'family living expense tracing.' " (*In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 823 (*Braud*).) "Under the 'family living expense' or 'recapitulation' method, it is assumed that family living expenses are paid out of community property funds. [Citations.] Payments may be traced to a separate property source by showing community income at the time of the payments or purchase was exhausted by family expense, so that the payments or purchase necessarily must have been made with separate property funds." (*Ibid.*)

"Whether the spouse claiming a separate property interest has adequately traced an asset to a separate property source is a question of fact for the trial court, and its finding must be upheld if supported by substantial evidence." (*Braud, supra,* 45 Cal.App.4th at p. 823.) Again, Linda does not challenge the sufficiency of the evidence to support the court's factual findings.

29

Linda also contends the court erred by rejecting her argument the 6,000 shares are community property under the lender's intent doctrine, since the stock was acquired partially on credit during the marriage.[10] "There is a rebuttable presumption that property acquired on credit during marriage is community so that '[i]n the absence of evidence tending to prove that the seller . . . primarily relied upon the purchaser's separate property in extending credit, the trial court must find in accordance with the presumption.' " (*Bank of California v. Connolly* (1973) 36 Cal.App.3d 350, 375-376; *Gudelj v. Gudelj* (1953) 41 Cal.2d 202, 210 (*Gudelj*).)  The "presumption is rebuttable upon a showing that the loan was extended on the faith of existing property belonging to the acquiring spouse." (*In re Marriage of Stoner* (1983) 147 Cal.App.3d 858, 864.) Evidence of lender reliance on a spouse's separate property may be either direct or circumstantial. (*Grinius, supra,* 166 Cal.App.3d at p. 1187.)

The court declined to apply the lender's intent doctrine, in part because the "evidence is unclear whether there was a lender-borrower relationship between Brown and Charles . . . "  Brown was asked whether he considered himself to be in a debtor-creditor relationship with Charles, and he testified, "I never really thought about it."  He

---

10    In her opening brief, Linda asserts the lender's intent doctrine applies only to the 6,000 shares.  In her reply brief, she asserts the doctrine also applies to the 4,000 shares since Charles also signed the promissory note for those shares during the marriage. However, "[a]n appellant's failure to raise an argument in the opening brief waives the issue on appeal." (*Telish v. State Personnel Bd.* (2015) 234 Cal.App.4th 1479, 1487, fn. 4.)

also stated he did not consider himself a lender because he and Charles had a contractual arrangement for Charles's purchase of the shares.[11]

Linda asserts the court erred as a matter of law by finding the lack of a debtor-creditor relationship for purposes of the lender's intent doctrine. Charles's briefing is unhelpful. He cites no authority to support the court's finding on the issue, he merely repeats the finding.

We agree with Linda on this point. "To be sure, 'A loan transaction contemplates a debtor-creditor relationship with an obligation of the "debtor" to repay the amount of the loan to the creditor. . . .' " (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 802.) We see no reason to disregard the lender's intent doctrine based on a seller's testimony he did not consider himself a lender. The issue is one of law drawn from the promissory note, not one for Brown's opinion. We are not cited to any authority for the proposition that an option agreement anticipating a promissory note precludes the creation of a debtor-creditor relationship on execution of the note.

2

Alternatively, the court determined the evidence was unclear as to "what property Brown relied on in extending credit to Charles," and thus "the evidence is insufficient to support the intent of the lender doctrine." The court presumably misunderstood the lender's intent doctrine. To rebut the community property presumption raised by the promissory note, it was *Charles's* burden to prove that Brown primarily relied on

---

[11]    Brown's testimony was specifically addressing Charles's purchase of 4,000 shares, but it appears the court determined, and reasonably so, that it applied to all of the shares.

Charles's separate property for payment of the $18,668,588.80 debt.  (*Grinius, supra,* 166 Cal.App.3d at p. 1187.)

Charles states, "Brown . . . 'clearly relied on Charles'[s] separate property business (BIP) in extending credit to Charles.' "  Charles provides no supporting citation to the record, in violation of a basic principle of appellate practice.  (Cal. Rules of Court, rule 8.204(a)(1)(C).)  We have independently determined he has provided a partial quote from the court's statement of decision on Phase II, which misleadingly omits all the language unhelpful to him.  The full sentence reads:  "*While* Brown clearly relied on Charles's separate property business (BIP) in extending the credit to Charles, *it is unclear whether Brown specifically relied on Charles'[s] community property BIP compensation or Charles'[s] separate property BIP profit distributions*."  (Italics added.)[12]

The court's factual finding is final and conclusive on review when supported by substantial evidence, "even though evidence conflicts or supports contrary inferences."  (*Grinius, supra,* 166 Cal.App.3d at p. 1185.)  Brown testified he did not analyze Charles's creditworthiness "[b]ecause I knew how successful the company was and I knew how much [Charles] was making."  He knew Charles was married to Linda, but he had no conversation with Charles in which the term "separate property" or "community property" arose.  He never considered whether Charles had any separate property.  On

---

12    As a commentator cautions:  "Misstatements, misrepresentations and/or material omissions of the relevant facts or law can instantly 'undo' an otherwise effective brief, waiving issues and arguments; it will certainly cast doubt on your credibility. . . ."  (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 1997) ¶ 9:27, p. 9-8 (rev. 2014).)

32

this record, we must uphold the court's finding on the state of the evidence. "There being no satisfactory evidence to contradict the presumption, it must prevail." (*Gudelj, supra,* 41 Cal.2d at p. 211.)

The community's ownership interest, however, does not extend to the entire 6,000 shares, but only to the number of shares purchased under the promissory note, which is unclear from the record. The lender's intent doctrine "applies only to the characterization of loan proceeds obtained during marriage." (*In re Marriage of Starr* (2010) 189 Cal.App.4th 277, 288.) Charles rebutted the general community property presumption as to the down payment (§ 760), by tracing it to his separate property. (*Gudelj, supra,* 41 Cal.2d at pp. 209-211 [husband rebutted presumption of community property as to 3/23 of business interest by tracing down payment to his separate property]; *In re Marriage of Aufmuth* (1979) 89 Cal.App.3d 446, 455, disapproved of on another point in *In re Marriage of Lucas* (1980) 27 Cal.3d 808, 858 ["there is substantial evidence to support the trial court's finding that the down payment was and continued to be separate property interest held by wife in the residence"].) Charles separately owns the percentage of shares purchased with his down payment. For example, if the down payment was 25 percent of the full purchase price, he separately owns 1,500 shares.

Indeed, Charles also traced all payments on the $18,688,588.80 promissory note to his separate property. Notably absent from Linda's appellate briefing is the concession in her trial brief for Phase II that "[t]o the extent the BIP distributions are the separate property of Charles, he is entitled to a [section] 2640 credit resulting from a partial pay down of the note" for the 6,000 shares. She repeated the concession in her written

33

closing argument. The only discrepancy in her concessions is the claim Charles only *partially* paid for the shares from his separate property.

Section 2640, subdivision (b) provides: "In the division of the community estate under this division, unless a party has made a written waiver of the right to reimbursement or has signed a writing that has the effect of a waiver, the party shall be reimbursed for the party's contributions to the acquisition of property of the community property estate to the extent the party traces the contributions to a separate property source. The amount reimbursed shall be without interest or adjustment for change in monetary values and may not exceed the net value of the property at the time of the division." Charles is entitled to reimbursement under section 2640 because his separate property paid off the promissory note. (*In re Marriage of Weaver* (2005) 127 Cal.App.4th 858, 865.)

We reverse the judgment insofar as it pertains to the 6,000 shares of BIP stock Charles purchased from Brown. On remand, the court is to conduct further proceedings to ascertain and value the separate property and community property interests in the shares, and to order reimbursement for Charles. The court should also consider whether the community is entitled to a commensurate share of any BIP profit distributions made to Charles after the community acquired an ownership interest in a portion of the 6,000 shares.

3

Additionally, Linda asserts that to the extent we conclude the 6,000 shares (or portion thereof) is Charles's separate property, reversal is required because the court's

34

statement of decision on Phase II does not address her argument Charles breached his fiduciary duty by not offering the community the opportunity to purchase the shares. She submits that "the community could have paid for the stock."

Linda cites section 721, subdivision (b), which specifies that "spouses are subject to the general rules governing fiduciary relationships that control the actions of persons occupying confidential relations with each other," and "[t]his confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners," as provided in Corporations Code section16404 and other provisions of that code. Corporations Code section 16404 lists the various fiduciary duty obligations a partner owes to the partnership and other partners, including the obligation to "account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner in the conduct of winding up of the partnership business or derived from a use by the partner of partnership property or information, *including the appropriation of a partnership opportunity*." (*Id.*, subd. (b)(1), italics added.)

Linda cites no authority suggesting a spouse's investment of separate funds in a separate business to increase his or her ownership percentage is a breach of fiduciary duty. Spouses are entitled to retain the separate property characteristic of a business begun before marriage. (Fam. Code, § 770.) In *Somps v. Somps* (1967) 250 Cal.App.2d 328 (*Somps*), the wife argued the husband breached his fiduciary duty to the community by purchasing property with his separate funds, and not using available community funds. The court rejected the argument, explaining: "The fact that husband purchased the Binkley property with his separate funds, as the trial court found, is not evidence of

35

taking any undue advantage nor is it a breach of a fiduciary relationship which would invoke a presumption of fraud or undue influence. There is no reason why husband should be compelled to keep his separate funds idle. Husband apparently had made many investments benefitting the community during the marriage which resulted in the substantial estate owned by the parties at the time of divorce." (*Id.* at p. 338.)[13] Likewise, Charles cannot be criticized for inadequately benefitting the community.

In any event, the court found there were no community funds available to purchase Brown's stock. Linda has expressly waived any challenge to the court's factual findings, and thus her citation to evidence she believes shows the community did have the funds is improper. Since her theory lacks merit, the omission of this issue from the statement of decision is nonprejudicial. (*Biscaro v. Stern* (2010) 181 Cal.App.4th 702, 709; Cal. Const., art. VI, § 13; Code Civ. Proc., § 475.)

IV

*Prejudgment Interest*

In her opening brief, Linda notes the court denied her request for prejudgment interest, under Civil Code section 3288,[14] on her share of the community's $3.6 million interest in BIP at the close of the *Pereira* period. She complains that the community

---

[13]    According to Linda, we should disregard *Somps* because it was decided in 1967, and Family Code section 721, subdivision (b)'s reference to Corporations Code section 16404 was not added until 2002. (Stats. 2002, ch. 310, § 1.) In our view, the language of *Somps* remains relevant and instructive.

[14]    Civil Code section 3288 provides: "In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury."

interest was "frozen as of 1991, but not divided for another 19 years." She did not

include prejudgment interest as an issue on appeal or develop any particular argument.

In her reply brief, Linda attempts to raise the prejudgment interest issue. She

asserts the court had discretion to award prejudgment interest on the theory Charles

breached his fiduciary duty to the community. She acknowledges that an appellant

ordinarily waives an issue by not raising it in the opening brief, but she asserts her

tardiness causes Charles no prejudice because he addressed the merits of the issue in his

respondent's brief.

Charles's brief, however, only cursorily reaches the merits. It neither discusses

Civil Code section 3288 nor addresses Linda's argument that interest is owed because of

his supposed breach of fiduciary duty. Linda waived review of the issue, and in any

event, we have concluded Charles is not guilty of any breach of fiduciary duty.

V

*Spousal Support*

Charles appeals the award of $450,000 per month in spousal support to Linda. He

contends that under section 4322,[15] support is foreclosed since her share of the

---

[15] Section 4322 provides: "In an original or modification proceeding, where there are no children, and a party has or acquires a separate estate, including income from employment, sufficient for the party's proper support, no support shall be ordered or continued against the other party." There is a split of authority on whether income derived from former community property is included in section 4322's definition of "separate estate." (See *In re Marriage of Terry* (2000) 80 Cal.App.4th 921, 930-931 & 935-947 (dis. opn. of Sepulveda, J.).) Further, "[w]hether an estate is sufficient for one's proper support is a fact question for the trial court." (*In re Marriage of McNaughton* (1983) 145 Cal.App.3d 845, 850 (*McNaughton*).)

community property exceeds $100 million, and if she invested it prudently it would generate enough cash to cover her actual postseparation expenses of approximately $100,000 per month. Alternatively, he contends the award is excessive. He faults the court for determining that given the opulent marital standard of living, Linda is entitled to spousal support in excess of her current actual expenses.

When the court ordered spousal support, Charles's income was $5.6 million per month. He argued that to generate more income, Linda should sell her New York City penthouse and her Del Mar home, or at least turn them into rent-producing assets. The court noted, "Charles makes that argument though Charles can retain the unfettered use of his estate, which is more than twice the size of Linda's," and, "It is inequitable to require Linda to sell part of her share of the assets to partially fund her needs in light of Charles'[s] ability to pay any reasonable spousal support the court orders." Without income from selling or renting some of her properties, Linda's income was approximately $33,000 gross per month.

Contrary to Charles's view, a spouse's "needs" are but one factor in determining a proper amount of spousal support. (*In re Marriage of Fransen* (1983) 142 Cal.App.3d 419, 424-425; § 4320.) "[T]he trial court must not limit itself to an award based entirely upon need." (*In re Marriage of Fransen,* at p. 425.) Further, a husband "is not entitled to a disproportionately higher standard of living than [the] [w]ife." (*McNaughton, supra,* 145 Cal.App.3d at p. 841.) Additionally, the court determined Linda needed additional time to "prudently and permanently invest all of her 'investable' assets, including the $10 [m]illion equalization payment awarded her herein. . . . [T]he post-separation period has

38

been a period of transition for Linda. Passing from a long[-]term[,] full[-]time stay[-]at[-]home spouse with no restrictions on her finances to a separated spouse with the necessity to manage her money, Linda has had to reset her life."

However, we decline to commit judicial resources to the resolution of an appeal that may be moot. In light of our partial reversal of the judgment on a community property issue, on remand the court must also revisit the spousal support issue. Among other key factors, in setting spousal support the court must consider the "assets, including the separate property, of each party." (§ 4320, subd. (e).) A spouse's share of community property are assets included in the equation. (*In re Marriage of Martin* (1991) 229 Cal.App.3d 1196, 1201.) Linda's share of the community's interest in the portion of the 6,000 shares Charles purchased from Brown under the $18,688,588.80 promissory note, along with any profit distributions BIP made thereon, may substantially increase her separate estate for purposes of section 4320 and require modification of spousal support.

## DISPOSITION

The judgment is reversed insofar as it pertains to Charles's purchase of the 6,000 shares from Brown. The matter is remanded to the trial court for further proceedings. The court is to (1) ascertain the percentage of shares that are Charles's separate property because he purchased them with his separate property down payment, and the percentage of shares that are community property because they were purchased under the promissory note; (2) value the community's interest in the percentage of shares belonging to the community; (3) consider whether the community is entitled to a commensurate share of any BIP profit distributions made to Charles after the community acquired an ownership

39

interest in a portion of the 6,000 shares; (4) divide the community's interest in the shares

and distributions between Linda and Charles; and (5) reconsider the spousal support

award in light of any changes to Linda's separate estate.  In all other respects, the

judgment is affirmed.  Linda is entitled to costs on appeal.


MCCONNELL, P. J.

WE CONCUR:


HUFFMAN, J.


MCINTYRE, J.

Filed 8/31/15

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of LINDA F. and CHARLES H. BRANDES. | D062729 |
| LINDA F. BRANDES, | |
| Appellant, | (Super. Ct. No. D485527) |
| v. | |
| CHARLES H. BRANDES, | |
| Appellant. | |

THE COURT:

The opinion in this case filed August 14, 2015, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to California Rules of Court, rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

_____
McCONNELL, P. J.