Filed 7/29/22 In re L.C. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re L.C., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. C.V., Defendant and Appellant. | G061119 (Super. Ct. Nos. 21DP0532, 21DP0532A) O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Vibhav Mital, Judge. Affirmed.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*　　　\*　　　\*

Following a combined jurisdiction and disposition hearing, the juvenile court issued an order exercising jurisdiction over minor L.C. but allowing her father (Father) to retain custody. Orange County Social Services Agency (SSA) later filed a petition to modify this order under Welfare and Institutions Code section 387.[1] It alleged the prior order was ineffective in protecting L.C. and sought to remove her from Father's custody. The court sustained the petition, and it later found at a separate disposition hearing that removal of L.C. was warranted. Father appeals, arguing the court erred in sustaining SSA's section 387 petition. We conclude the court's findings are supported by substantial evidence and affirm the orders.

I

FACTS AND PROCEDURAL HISTORY

A. *Petition and Initial Hearing*

During the relevant time period, Father and L.C.'s mother (Mother) shared physical custody of L.C. under a child custody order. Mother had primary physical custody of L.C., while Father had custody on Tuesdays and Wednesdays. On April 6, 2021, when L.C. was two years old, it was reported to SSA that she had sustained multiple bruises and scratches. Several other bruises were observed on her throughout April 2021. Both parents blamed the other for these injuries.

On May 14, 2021, SSA filed a juvenile dependency non-detain petition, which alleged jurisdiction over L.C. was proper under section 300, subdivision (b)(1). Among other things, the petition alleged (1) L.C. may have been physically abused while in the care of Mother and/or Father, (2) both parents denied engaging in physical abuse, and (3) L.C. was suffering or at risk of suffering serious emotional damage in the care of Mother and/or Father.

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

After the initial hearing on May 21, 2021, the juvenile court kept L.C. in her parents' custody but ordered them not to use any corporal punishments, to cooperate with SSA, and to cooperate with all referrals and services provided by SSA.

## B. Reports Prior to the Jurisdiction Hearing[2]

Throughout this period, SSA had difficulty obtaining Father's cooperation. Its first report, dated July 1, 2021, shows SSA called Father on June 1 to schedule an in-person interview. Father declined to meet in person, stating he does not like to drive far, and requested to meet virtually on June 3 at 10:00 a.m. SSA sent Father a link for the virtual meeting, but he failed to join the meeting. Father was also "hesitant with services." He failed to complete his live scan requirement by SSA's first report. And though he claimed to have completed some sessions of a parenting program, he was unable to provide any confirmation of completion.

Father was also uncooperative in allowing SSA to visit him and L.C. inside his home. He insisted on making video/audio recordings of SSA's in-home visits (apparently through security cameras). Such recordings violate SSA policy, so social workers were unable to enter Father's home. As such, most of the visits between SSA and Father were conducted outdoors. The inability of SSA to inspect Father's home created safety issues for L.C. Father worked as a security guard and had a firearm at home. Though he claimed the weapon was kept in a lock box, SSA was unable to confirm it was safely stored.

SSA's next report, dated August 16, 2021, noted continuing difficulties with Father. He still had not completed live scan. Though he reported participation in a personal empowerment program, he provided no verification. Father continued to deny social workers entry to his home unless they agreed to be recorded, so many meetings

---

[2] This appeal only concerns Father, so we focus on the facts relevant to him.

between SSA and Father occurred outdoors. During one visit, SSA met Father in the parking lot of a local high school. Father attempted to record the meeting on his phone and had to be instructed to stop. SSA was finally able to conduct an in-home visit with Father in August 2021, in which it observed that his firearm was stored in a black lock box in a closet out of L.C.'s reach.

Father also exhibited issues coparenting with Mother. For example, Mother alleged that during one exchange of L.C., Father arrived an hour late, provided no explanation for his tardiness, handed L.C. to her, and told L.C., "'[Mother's] going to kill you.'"[3] Due to the continuing conflict between the parents, the juvenile court ordered SSA to supervise all exchanges of L.C. between Mother and Father.

SSA's reports following this order note several concerns with Father's conduct during supervised exchanges. He routinely arrived late. He also refused to get out of his car to facilitate the exchange of L.C. with Mother. Rather, he would pass L.C. to Mother through the driver side window of the car during drop offs. Likewise, during pickups, he would take L.C. from Mother through the same window. This behavior concerned SSA, since L.C. could potentially fall out of the window during hand offs. But Father ignored social workers when they advised him to exchange L.C. with Mother in a safer manner.

During one SSA-supervised exchange in September 2021, Father arrived 15 minutes late to drop off L.C. The social worker approached his car and asked Father if he had told Mother of his arrival. But Father ignored the social worker and set up his phone to record. L.C. was in the passenger seat standing on the lap of an unidentified female. The passenger window was rolled down and "[L.C.] was trying to climb out of the window." The social worker asked the passenger to hold L.C. to ensure she did not fall

---

[3] Father claimed he said that "[M]other would 'carry'" her as he handed L.C. to Mother. But when SSA asked Mother whether she may have misheard "kill" instead of "carry," she was sure he had said "kill" due to his body language and facial expressions.

4

through the window. The passenger did not respond. The social worker then asked the passenger for her name. She did not respond, and Father motioned her to be quiet. Father also appeared to get upset. He got out of the car, started walking on the sidewalk, and began mimicking the social worker, saying "'what's your name, what's your name?'" Father later testified at a hearing that the female passenger was his girlfriend.

Social workers also began examining L.C.'s body for new bruises and marks following exchanges. Several of these examinations uncovered new bruises and marks after L.C. returned from Father's care. But SSA was unable to substantiate any physical abuse. When Father was asked about the bruises by SSA, he either failed to reply or stated they were accidentally sustained while playing. Though Mother blamed Father for some of the injuries, she acknowledged L.C. was very active and sometimes sustained accidental bruises. Doctors "concluded that the injuries caused matched the parent's story in some instances, but [they had] concerns as to the young age of the child and the amount of bruising to the child."

## C. The Jurisdiction/Disposition Hearing

A combined jurisdiction and disposition hearing commenced in October 2021 (the jurisdiction hearing).

Generally, Mother had been cooperative with SSA throughout the process. By the time of the hearing, she had completed a personal empowerment program, a parenting program, and was engaged in counseling and in-home support services as well as random drug testing.

In contrast, SSA expressed concerns about Father at the hearing. Though he had completed a parenting class, SSA was unable to confirm he had actually participated or learned anything because he failed to provide consents allowing SSA to speak with his therapist.

Father had also been uncooperative with multiple social workers. He continued to record social workers after being told it was against SSA policy. He also routinely failed to make himself available for home assessments. For example, he refused to answer his door for unannounced visits even though social workers saw him looking at them through the window. Due to Father's continual failure to allow access to his home, SSA was unable to verify that the home was safe for L.C. This was especially important given SSA's knowledge that Father "own[ed] some weapons." L.C. also continued to return from Father's care with unexplained injuries. Still, SSA was unsure that removal was appropriate since none of the abuse allegations against Father had been substantiated.

Father denied needing any services to improve his parenting. He also explained that he had told his girlfriend not to identify herself to the social worker because "legally she doesn't have to identify herself." However, Father divulged that his girlfriend had been present at his visits with L.C. and that the girlfriend had been alone with L.C. He was also aware that Mother had alleged his girlfriend had hit L.C.

The juvenile court issued its ruling on October 15, 2021 (the October 15 ruling). It sustained the majority of the allegations in SSA's petition. L.C. was declared a dependent of the juvenile court, but she was allowed to remain in the custody of her Mother and Father as they engaged in family maintenance services. Though SSA had not recommended that L.C. be removed from Father's care, the court stated it was "a very close call" as to whether removal was appropriate. "[H]is actions to date very possibly put [L.C.] at a substantial danger of physical health, safety, protection, physical or emotional well-being."

The juvenile court issued several orders to address Father's behavior, including to (1) cease all recording of visitation or exchanges or of any component of the dependency matter; (2) comply in providing access to his home for unannounced and announced visits by SSA; (3) participate in anger management and sign appropriate

6

releases; and (4) secure and keep safe all weapons in his home. Likewise, the court ordered SSA to "conduct home checks to confirm all weapons are safe and secure." It also instructed SSA to file a petition under section 387 to remove L.C. from Father's care if he violated these orders. The court further warned Father that "[c]ertain things need[ed] to change, and if they" did not, the court would "have no choice but . . . to remove [L.C.] from [his] custody."

*D. The Section 387 Petition and Detention Hearing*

On November 12, 2021, SSA filed a petition under section 387 (the 387 petition) to modify the October 15 ruling and remove L.C. from Father's custody. The 387 petition alleged Father had failed to comply with the orders listed in the October 15 ruling. Among other things, it alleged that "[o]n November 10, 2021, the [F]ather was observed recording the exchange of the child. When confronted, the [F]ather denied the existence of the courts [*sic*] order. Further, from October 15 to November 10, 2021, the [F]ather prevented SSA from inspecting his home and/or observing visitation with the child on two occasions."

Prior to the initial hearing on the 387 petition, SSA filed a report summarizing its recommendation that L.C. be detained from Father. It stated that on October 27, 2021, SSA informed Father that a home assessment and visit observation would be conducted following the parental exchange of L.C. on Tuesday, November 2. The day of the assessment, though, Father claimed he was unavailable because he had been called into work. The social worker cooperated and rescheduled for November 9. Father thanked her for understanding. But on November 9, Father "declined [the assessment] and stated that he and [L.C.] were going to the zoo. [Father] indicated that he never agreed to meet."

During the exchange of L.C. from Father to Mother on November 10, the social worker observed Father using a dash cam in violation of the October 15 ruling.

7

When the social worker asked if he was recording, Father got "within inches" from her face and started asking "'why' with a raised voice, in what appeared to be an effort to . . . intimidat[e]." When the social worker stated he was violating a court order, Father said "'what court order' then [told her] to back up." SSA inspected L.C. following that exchange and discovered new bruises on her ribs. When SSA asked Father about the injuries, he requested a photo. But he failed to respond after being sent a picture of the bruises.

At an initial hearing on the 387 petition on November 16, 2021, it was also revealed that Father had not yet begun anger management classes. Following the hearing, the juvenile court ordered L.C. to be detained from Father and granted him six hours of weekly supervised visitation. It scheduled an adjudication hearing on the 387 petition for January 20, 2022.

## E. The Adjudication and Disposition Hearings

Between the detention hearing and the adjudication hearing, SSA contacted Father numerous times to schedule a meeting to discuss the allegations in the 387 petition. Father resisted any attempts to meet. Rather, he insisted that prior to any meetings, SSA had to agree to respect his "constitutional[ly] protected rights." But he failed to identify any specific rights.[4] SSA offered to email him a copy of the 387 petition for him to review and respond. Father refused to provide an email address and demanded that SSA send him the allegations from the 387 petition through text message, which SSA did. In response, Father claimed SSA had made false reports, provided false testimony, and had violated their own policies, the Constitution, and federal and state law.

---

[4] At the February 10, 2022 disposition hearing, Father claimed SSA was violating his constitutional right to record in public and in his home, his right to avoid self-incrimination, and his right to own firearms.

8

No visitation occurred between L.C. and Father during this period. A social worker contacted him multiple times to coordinate monitored visitation with L.C. But Father accused the social worker of lying and making false reports and blamed SSA for his lack of contact with L.C. He demanded an apology from SSA before commencing any visitation with L.C. Father also failed to attend counseling or participate in any anger management classes.

Father did not attend the adjudication hearing on January 20, 2022. While he instructed his attorney to request a continuance, he repeatedly failed to provide his attorney with any grounds to justify this request. The juvenile court denied the continuance and sustained the 387 petition.

A disposition hearing on the sustained 387 petition was held on February 10, 2022. SSA made no progress with Father between the adjudication and disposition hearings. Similarly, no visitation occurred between Father and L.C. during this period. At the disposition hearing, the court removed L.C. from Father's custody.

On appeal, Father argues there is insufficient evidence to support the juvenile court's order sustaining the 387 petition. Therefore, he contends the disposition hearing should not have occurred and the resulting removal order is invalid. We disagree and affirm the court's January 20, 2022 order sustaining the 387 petition and its February 10, 2022 order regarding L.C.'s removal.

II

DISCUSSION

A. *Applicable Law*

"A section 387 supplemental petition . . . is used to change the placement of a dependent child from the physical custody of a parent to a more restrictive level of court-ordered care. [Citations.] A supplemental petition must contain a concise

9

statement of facts sufficient to support the conclusion that the previous disposition has not been effective in the rehabilitation or protection of the child." (*In re D.D.* (2019) 32 Cal.App.5th 985, 989-990.)

"The hearing on a supplemental petition is bifurcated. [Citations.] The court first conducts an adjudicatory hearing at which it must find by a preponderance of the evidence that the factual allegations of the supplemental petition are or are not true, and that the allegation that the previous disposition has not been effective is or is not true. [Citations.] The rules governing jurisdictional hearings apply to the adjudicatory hearing phase on a supplemental petition. [Citations.] If the court finds that the allegations of a supplemental petition are true, it conducts a further dispositional hearing to determine whether there is a need to remove a child from his or her current level of placement. [Citations.] The rules that govern an initial disposition hearing apply to a further dispositional hearing on a supplemental petition."[5] (*In re D.D.*, *supra*, 32 Cal.App.5th at p. 990.)

The juvenile court's findings at the adjudication and disposition phases are reviewed for substantial evidence. (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161-1162.) Under this standard, "'[o]ur review is limited to a determination whether there is any substantial evidence, contradicted or uncontradicted, that supports the finding. [Citation.] In so reviewing, all conflicts must be resolved in favor of [the prevailing party] and all legitimate and reasonable inferences must be indulged to uphold the finding.'" (*In re Marriage of Brandes* (2015) 239 Cal.App.4th 1461, 1472.)

Here, Father only challenges the juvenile court's findings at the adjudication phase, arguing they are unsupported by substantial evidence. He does not challenge any of the court's findings at disposition phase. Rather, he contends, "the

---

[5] Some cases refer to adjudication hearings under section 387 as jurisdictional hearings. (See, e.g., *In re Jonique W.* (1994) 26 Cal.App.4th 685, 691.) We use the term "adjudication" hearing to distinguish it from the jurisdiction hearing in this case.

juvenile court had insufficient grounds to proceed to a dispositional hearing, so the dispositional order under section 387 must be vacated." Thus, the removal order will stand if the court's findings at the adjudication phase are adequately supported by the record.

## B. Analysis

At the adjudication phase, "the juvenile court is required to make findings whether: (1) the factual allegations of the supplemental [section 387] petition are or are not true; and (2) the allegation that the previous disposition has not been effective in protecting the child is, or is not, true." (*In re Jonique W.*, *supra*, 26 Cal.App.4th at p. 691.) Father appears to make two arguments. First, "there was insufficient evidence to prove [L.C.] was at substantial risk of serious physical harm." Second, there was insufficient evidence "that the previous disposition was ineffective in protecting [L.C.]" Neither argument is persuasive.

### 1. Substantial risk of serious physical harm

Father contends, "[s]ubstantial evidence did not support the court sustaining the section 387 petition regarding [L.C.] being at risk of serious physical harm due to [F]ather violating the court orders . . . ." But this argument is based on a faulty premise: that the juvenile court needed to find L.C. was at risk of serious physical harm to sustain the 387 petition. Not so. As explained below, there was no need for the court to make such a finding at the adjudication phase.

Father's argument appears to be based on section 300, subdivision (b)(1). This subdivision authorizes juvenile courts to exercise jurisdiction over a child when "there is a substantial risk that the child will suffer, serious physical harm . . . , as a result of the failure or inability of the child's parent . . . to adequately supervise or protect the child." (§ 300, subd. (b)(1).) Father ostensibly believes that since SSA's initial petition

was brought under this subdivision, its 387 petition must also establish a substantial risk of serious physical harm to L.C. But no such showing is required.

Significantly, the standards set forth in section 300, subdivision (b)(1) pertain to *jurisdiction*, not modification of an existing order. When a modification petition is filed under section 387, "there already exists a basis for juvenile court jurisdiction. The law does not require that a fact necessary to establish jurisdiction under section 300 be established to warrant a change in placement." (*In re Joel H.* (1993) 19 Cal.App.4th 1185, 1200 (*Joel H*).) As such, "[a] section 387 petition need not allege any new jurisdictional facts, or urge different or additional grounds for dependency because a basis for juvenile court jurisdiction already exists. [Citations.] The only fact necessary to modify a previous placement is that the previous disposition has not been effective in protecting the child." (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161.) Demonstration of "physical or emotional abuse [is not] the test under section 387 for modifying a previous placement." (*Joel H.*, at p. 1200.)

### 2. *Effectiveness of October 15 ruling*

"Section 387 does not identify the evidence necessary to support a finding that a prior disposition was not effective in protecting a dependent child. . . . Presumably, though, the goal is to protect the child from some perceived danger or actual harm." (*Joel H.*, *supra*, 19 Cal.App.4th at pp. 1200-1201.) Accordingly, there must be evidence in the record that Father's failure to comply with the October 15 ruling created some risk of harm to L.C. But the evidence need not show a substantial risk of serious physical harm as required by section 300, subdivision (b)(1). (*In re T.W.*, *supra*, 214 Cal.App.4th at p. 1161; *Joel H.*, at pp. 1200-1201.) That standard has been met here.

The juvenile court was clearly concerned for L.C.'s safety at the jurisdiction hearing. While it did not remove L.C. from Father's custody at that time, it made specific orders in the October 15 ruling designed to reduce her risk of harm. The

court appeared to believe that if Father complied with those orders, the risk of danger to L.C. would be just below the "substantial danger" threshold required to remove her from his care. (§ 361, subd. (c)(1); *In re D.D.*, *supra*, 32 Cal.App.5th at p. 990.) Conversely, if he failed to comply with them, the risk of harm to L.C. would increase to a level warranting removal. The court therefore instructed SSA to file a 387 petition if Father violated the orders.

There is no serious dispute Father violated several of the orders contained in the October 15 ruling. Regardless, the juvenile court's findings on this issue are supported by substantial evidence. First, Father violated the order to provide SSA access to his home for an assessment. He failed to make his home available to SSA on November 2 and 9, 2021. Moreover, following the November 16, 2021 detention hearing, Father continued to refuse SSA access to his home. Second, Father violated the court's order to participate in anger management classes. He had not participated in them as of the January 20, 2022 adjudication hearing.

In response, Father maintains that even if he violated these orders, there is insufficient evidence such violations put L.C. at risk of harm. We disagree.

We start with Father's failure to allow SSA access to his home. It is undisputed he owns a firearm. As such, the juvenile court described the gravity of this order at the jurisdiction hearing: "[T]here may be weapons in the home. [SSA] has to be able to make a home check to determine if there are, that they are safe and secured. If [Father] does not allow the agency to make those necessary home checks and safety checks, I am absolutely directing [SSA] to file a 387 petition to have [L.C.] removed from his custody." Compliance with this order was vital. SSA needed to continually ensure Father's weapons were safely stored because irreparable tragedy could result if they were not. Since Father denied SSA access to his home, SSA could not verify safe

13

storage of Father's weapons. Accordingly, Father's refusal to comply with this order put L.C. at sufficient risk to warrant modification of the October 15 ruling.[6]

Father appears to argue his violation of the home access order was minor because he only denied SSA access once, on November 9, and a single violation of the order was insufficient to warrant modification. His cancelation of the November 2 assessment was defensible, he suggests, because he was called into work. If Father had a history of cooperation with SSA or compliance with court orders, this argument might be persuasive. But he does not, which is detailed above. (See *In re Jasmon O.* (1994) 8 Cal.4th 398, 424 [a parent's past actions may be predictive of the future].) Further, the context for his refusal of the November 9 assessment demonstrates a lack of willingness to comply with the order generally. After Father became unavailable for the November 2 assessment, SSA rescheduled it for November 9. Father thanked SSA for understanding. But on November 9, Father abruptly reversed course. He claimed, "he never agreed to meet" and declined the home assessment. Based on this behavior, the court could infer Father's refusal of the November 9 assessment was made in bad faith and that he had no intention of complying with the home access order.

Moreover, Father refused to attend anger management classes. The juvenile court expressed concern at the jurisdiction hearing that Father's need for control led to actions that put L.C. at risk. It explained, "[i]t is clear that [F]ather's general conduct is driven by a need to control every aspect of everybody's life in this case. . . . [E]verything points to a pattern of controlling behavior. It is that control that is causing a problem and potentially puts [L.C.] at risk." As an example, the court noted that his controlling behavior led him to park the car in the middle of the street during exchanges

---

[6] Though SSA assessed the storage of a firearm at a scheduled visit in August 2021, the juvenile court could reasonably believe further assessments were necessary. Nor does Father argue this single assessment sufficiently eliminated the risk of harm to L.C.

and to hand and receive L.C. to Mother through the car window. The court ordered Father to attend anger management classes to address his underlying control issues.

By refusing to attend these classes, Father failed to address a source of risk to L.C.: his controlling behavior. As noted by the juvenile court, his need for control put L.C. in danger during past exchanges. And the record shows Father has continued to prioritize his need for control over L.C.'s well-being. Indeed, his desire to control the relationship with SSA led Father to skip months of visitation with L.C. Thus, the court could reasonably conclude his refusal to address his behavioral issues through anger management classes created an unacceptable level of risk for L.C.

Father analogizes to *Joel H.* and *In re H.G.* (2006) 146 Cal.App.4th 1, but both cases are inapposite. In *Joel H.*, the allegations in the section 387 petition were unsupported by substantial evidence. That is not true here. In *In re H.G.*, the juvenile court erred by sustaining a section 387 petition and removing the child without holding a separate disposition hearing. (*In re H.G.*, at pp. 17-18.) The portion of *In re H.G.* cited by Father discusses risk within the context of removal. (*Ibid.*) However, removal is an issue addressed at the disposition phase (*In re D.D.*, *supra*, 32 Cal.App.5th at p. 990), which is not at issue here. In summary, Father concedes he violated the court's orders. In doing so, he placed L.C. in a greater risk of harm, which supports the court's orders.

III

DISPOSITION

The juvenile court's orders are affirmed.


MOORE, ACTING P. J.

WE CONCUR:


GOETHALS, J.


MARKS, J.*


*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.