Filed 6/4/24  Marriage of Abolahrar & Nasiri CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re Marriage of MOHAMADALI ABOLAHRAR and AMITISS NASIRI. | B322873 |
| MOHAMADALI ABOLAHRAR, | (Los Angeles County Super. Ct. No. YD065303) |
| Respondent, | |
| v. | |
| AMITISS NASIRI, | |
| Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark Juhas, Judge.  Affirmed in part, reversed in part, and remanded for further proceedings.

Complex Appellate Litigation Group, Claudia Ribet and Charles M. Kagay for Appellant.

Dennis Temko for Respondent.

_____

# INTRODUCTION

Amitiss Nasiri appeals after a bench trial in this marriage dissolution case. She challenges four aspects of the trial court's property distribution. First, Nasiri contends the trial court erred in finding no community property interest in two car washes, Torrence Car Wash (TCW) and Newport Car Wash (NCW). Second, Nasiri alleges the trial court miscalculated the reimbursement it ordered her to pay to NCW. Third, Nasiri claims the trial court did not account for payments she made from a community property business to NCW. And fourth, Nasiri argues the trial court failed to require her ex-husband, Mohamadali Abolahrar, to reimburse Nasiri for tax refunds he received.

We conclude there is substantial evidence to support the trial court's finding that Abolahrar bought TCW with his brother Reza Abolahrar before marriage, and it was therefore not community property. Because Abolahrar acquired half of NCW from Reza[1] during marriage, that portion was presumptively community property, and the court erred in awarding it solely to Abolahrar. We also conclude the court erred in miscalculating Nasiri's reimbursement obligation. Lastly, the trial court failed to address funds Nasiri paid from a community property business to NCW and NCW's landlord, as well as the parties' 2012 tax refunds. On the award of NCW and the miscalculated and unaddressed funds and refunds, we reverse and remand. Otherwise, we affirm.

---

[1] Because Abolahrar and his brother Reza Abolahrar share the same last name, we use Reza's first name for clarity's sake. We mean no disrespect.

# FACTUAL AND PROCEDURAL BACKGROUND

A.     *The Parties' Marriage, Separation, and Dissolution*

Nasiri and Abolahrar married on September 1, 2004 and separated on May 30, 2014.  Abolahrar petitioned for dissolution on July 15, 2014.

B.     *Abolahrar and Reza Acquire Two Car Washes*

A primary issue in this appeal is the characterization and division of NCW and TCW.  At trial, Nasiri contended the community had a significant interest in both car washes, whereas Abolahrar asserted NCW was his separate property and TCW was Reza's property.

1.     *NCW*

Abolahrar testified that he and Reza jointly purchased NCW in 2004 from Philip Ronis.  Ronis testified he sold NCW to Abolahrar, had "some conversation with his brother, Reza," and "believe[d] they were both involved."  Reza testified that he and Abolahrar bought NCW 50/50 in 2004.  Abolahrar became the president of NCW on May 6, 2004.

Abolahrar paid $1.465 million in cash of the total $2.2 million purchase price for NCW.  He paid $100,000 from an account in his name with funds from his former pharmacy business, and $1.365 million from an account in his name with funds from the sale of a house in Rancho Palos Verdes.  The remainder of the purchase consisted of two carryback notes from Ronis, which Abolahrar guaranteed.  Reza and his wife paid off the carryback notes within two months of the purchase.

3

Nasiri asserts there are inconsistencies in the record about the ownership of NCW. At trial, Reza testified he was the sole shareholder of NCW in 2004 and Abolahrar had never been a shareholder of NCW. NCW's 2004 and 2005 corporate tax returns list Reza as the sole shareholder. When asked why Abolahrar was not listed on the tax returns, he stated, "I honestly don't have a logical explanation." The 2006 to 2008 tax returns state Reza and Abolahrar were each 50 percent shareholders. The portion of the 2009 return in evidence did not show the shareholders. The 2010 to 2014 tax returns show Abolahrar as the sole shareholder.

At trial, Reza testified there is a "huge difference between shareholder[s] and owners. . . . I was issued the certificate of stock, but our understanding between me and him is . . . that it was 50/50." When asked why shares were not issued at 50 percent to Abolahrar if they were buying NCW as equal partners, Reza stated, "I have no idea why it was done that way. It's 20-something years ago. I don't know. I have no explanation for you."

In July 2017, Reza and NCW filed a lawsuit against Nasiri in Orange County Superior Court. In the complaint, Reza contended, "Reza Abolahrar is, and always has been, 100% owner and sole shareholder of Newport Car Wash, Inc." Reza requested the court declare he was the sole owner of NCW. In a declaration filed in the same case, Reza stated that he purchased NCW in 2004 "with an agreement between me and my brother that he would eventually purchase the car wash from me in the future." He claimed that Abolahrar began making $5,000 monthly payments in September 2009. Reza further asserted that, as of the date of the declaration, "more than $100,000 in payments

4

remain to be made" and therefore he had "not transferred legal title of the shares in the company to [Abolahrar]." The court in the Orange County case held Reza "failed to convince the court that [Reza] owns 100% of the stock of plaintiff Newport Car Wash, Inc., and that [Abolahrar] owns no interest in the car wash which could be community property and subject to the jurisdiction of the family law court."

Outside court proceedings, Abolahrar completed a credit application for NCW in 2011. Abolahrar represented that he was NCW's CEO with a 50 percent ownership interest, and that Nasiri was NCW's president with a 50 percent ownership interest. At trial, Abolahrar testified that he had "absolutely no idea" why he had represented that Nasiri had a 50 percent ownership in NCW, but stated "[i]t doesn't seem to be a significant document."

### 2. *TCW*

At trial, Abolahrar and Reza testified they bought TCW together in 2004. The purchase was for the business without the land. Abolahrar stated he took over operations in August 2004 when the money was in escrow because the seller was eager to "take off." Escrow closed on September 2, 2004, the day after the parties' marriage. The lease amendment for TCW, which assigned the lease to Abolahrar, was dated August 10, 2004.

Abolahrar testified he paid $860,000 of the total $4.2 million purchase price in cash. Abolahrar paid $50,000 from his pharmacy business account with a check in March 2004 and wired $810,000 from his personal bank account in August 2004. The brothers also acquired a $2.1 million loan from Beach Business Bank and two carryback notes of $500,000 and $90,000

from TCW's seller. Abolahrar was one of several people who guaranteed the bank loan. The bank loan was dated August 9, 2004. Nasiri testified that the loan applications were submitted before the marriage and that she was not on the loan. Abolahrar testified Reza and his wife paid the remainder of the down payment.

Nasiri again asserts there are inconsistencies in the record about the ownership of TCW. In October 2017, Abolahrar filed a declaration in this case in opposition to Nasiri's motion for joinder of TCW and Reza. He stated, "I have never held any ownership interest whatsoever in Torrence Car Wash. Neither the community or I currently own or have ever owned any interest in Torrence Car Wash. [Nasiri] is seeking a joinder of my brother's business as a baseless method of harassment." Earlier that year, in July 2017, however, Abolahrar filed a declaration stating, "I sold the entirety of my shares in Torrence Car Wash to my brother Reza Abolahrar in 2006." In a September 2017 declaration, Reza stated, "Since 2004, I am the sole 100% shareholder of Torrence Car Wash, Inc."

C.      *Work at the Car Washes, Abolahrar's Incarceration, and Nasiri's Dental Practice*

At trial, Nasiri testified Abolahrar worked at both TCW and NCW in 2004 after the parties married. Abolahrar agreed that when the parties married, he ran day-to-day operations at NCW, including scheduling, payroll, and taxes. But Abolahrar denied ever working at TCW or being involved with its operation after the purchase, during which time he was the president.

Nasiri stated she worked at both car washes between the end of 2005 and October 2008 and consistently worked at TCW.

In 2006, Abolahrar and Reza went to prison for felony healthcare fraud and conspiracy, stemming from their prior work at pharmacies.  Abolahrar ran NCW until he went to prison in 2006.  He resigned as TCW's president in 2006 before going to prison.  The brothers were incarcerated from 2006 to 2009.  Abolahrar's younger brother, Ali Ahrari, ran both car washes while Abolahrar and Reza were incarcerated.

In October 2008, Nasiri opened a dental office.

D.    *After Incarceration, Abolahrar and Reza Acquire Each Other's Interest in the Car Washes*

In 2009, Abolahrar and Reza decided to end their partnership in the car washes.  The brothers agreed Reza would take over TCW and Abolahrar would take over NCW.  The brothers determined NCW was more profitable because they owned it outright, whereas they had not yet paid off the carryback notes from TCW's seller.  The brothers also considered that Reza had paid more than $500,000 in victim restitution for the brothers' crimes.

Abolahrar testified, "[s]o for that consideration, and whatever that I owed him or he owed me," Abolahrar agreed to pay Reza $5,000 a month via check from NCW for 10 years and to pay half of the balloon payments on the carryback notes of $500,000 and $90,000 from TCW's seller.  Abolahrar paid TCW's seller $125,000 in September 2009 and $45,000 in August 2010 with funds from NCW.  Abolahrar paid Reza the monthly payments until January 2019.  Abolahrar has been the president of NCW since at least 2010.

E.    *Relevant Payments, Withdrawals, and Tax Returns*

There were several issues of reimbursement in this case. Before the parties' separation, Nasiri wrote several checks to the landlords of NCW for rent: $21,534.70 in April 2012, $21,534.70 in November 2012, and $22,180.74 in March 2014. Abolahrar testified that in mid-2013, he was having cash flow problems and would ask Nasiri to contribute to NCW's rent.

In June 2017, Abolahrar showed up for a child custody exchange, but his children were absent and he was met by immigration authorities. He was in custody for 44 days from June until August 2017 for immigration-related issues. Abolahrar testified that during his detention by immigration authorities, Nasiri took money from him. Abolahrar testified that in July 2017, Nasiri redirected $55,244.75 in credit card payments from NCW to her dental practice bank account.

Abolahrar claimed that during the same time, Nasiri withdrew funds from his personal bank account using a revoked power of attorney[2] and forged an unauthorized check from NCW to her dental practice. On July 25, 2017, the court ordered Nasiri to provide an accounting of the withdrawal and the check. Abolahrar also testified that Nasiri stopped paying the mortgage on the family residence at the end of 2017, in September 2020, and in March 2022, in violation of a court order and the parties' stipulation regarding mortgage payments. These amounts are not at issue on appeal.

---

[2]    Nasiri testified it was a joint account and she withdrew the money to pay NCW's payroll.

F.    *Trial Court Proceedings*

In August 2018, Nasiri filed a cross-complaint in this marriage dissolution action, naming Reza as a defendant and NCW and TCW as nominal defendants. In 2018, the court entered a stipulated judgment establishing child custody and visitation. In 2018 and 2019, the court conducted a trial on the bifurcated issue of characterizing the family residence, which is not at issue on appeal. Relevant here, in March 2022, the court conducted an eight-day trial on all remaining issues.

1.    *March 28, 2022 discussion about tax returns and the car washes*

At the end of trial, on March 28, 2022, the court stated it wanted to resolve issues on which the parties agreed. Nasiri contended she was entitled to reimbursement for half of certain tax return refunds: the 2012 federal refund of $23,075, the 2012 state refund of $13,490, the 2013 federal refund of $66,838.75, the 2013 state refund of $357, and the $4,968 credit received in 2013 from the 2012 state return. Abolahrar agreed that tax refunds, including the 2013 federal refund of $66,838.75, were community property, but did not recall getting checks for amounts other than $66,838.75. Abolahrar stated the 2012 refunds might have rolled over into the check for $66,838.75. The court did not resolve the issue at the time.

Regarding TCW and NCW, on the same day, the trial court stated, "[Abolahrar], essentially, said that [the brothers] swapped out Torrence Car Wash and Newport Car Wash. That they bought them together before marriage, both of them. They were both separate property assets. They bought them as brothers.

9

And then, during the marriage, they said you take your half of this, and I take my half of that."

## 2.  *April 1, 2022 ruling*

On April 1, 2022, the court issued a "Ruling on Matters Taken Under Submission on March 28, 2022." It indicated, "This is the court's ruling on the submitted matter following a multi-day trial." Regarding credibility, the court stated, "Both parties indicate that the other has not been forthcoming with useful data in the case. . . . While [Abolahrar] certainly had a motive to embellish his position, the independent witnesses tended to support [Abolahrar] and not [Nasiri]."

Regarding the car washes, the court stated, "The car washes are intertwined when analyzing their character. [Abolahrar] argues that the carwashes were a joint venture between himself and his brother Reza Abolahrar. [Nasiri] seems to argue that the purchase of the car washes was all a ruse, and that the community has an ownership interest in both car washes. [Nasiri's] argument fails." The court found that "both carwashes were purchased before marriage, and thus were [Abolahrar's] separate property." The court found Ronis was a credible witness with "absolutely no stake in the outcome of the trial" and that his testimony was consistent with Abolahrar's.

The court accordingly awarded NCW to Abolahrar as "his sole and separate property." Regarding TCW, the trial court found that TCW was purchased before marriage with funds that "were all acquired before the marriage and would all be separate property." The court found "that escrow closed, and the deed of trust was recorded the day after marriage does not make TCW a community asset." The court stated, "[Abolahrar] and his brother

can treat these two separate property businesses how they wish, they can give them to each other, sell them to each other, or pass money back and forth between them, all without effect on the community." It awarded TCW to Reza "at zero value to the community."

The trial court found that because the car washes were presumptively separate property, it was Nasiri's burden to prove a community interest and she failed to "present a cogent analysis of a money flow from the community to either business that would have resulted in either a transmutation or a community interest in either asset."

The ruling also addressed some issues of reimbursement. The court adopted the parties' "stipulation concerning the tax refund in the amount of $66,838.75 entered in open Court on March 28, 2022." In 2017, the court had ordered Nasiri to provide accountings for a bank withdrawal and a check from NCW. In the April 2022 ruling, the court stated the accountings "were never made, or at least are not in evidence before the court," and ordered Nasiri to reimburse NCW for those amounts. The trial court also ordered Nasiri to reimburse NCW for several sums she took "inappropriately," including (1) $55,244.75 for credit card charges redirected to her dental practice in 2017, (2) $12,444 for subtenant rent, and (3) $17,342.50 for a check from Fletcher Jones.

The court found Nasiri's dental practice was community property.

### 3. *Nasiri requests a statement of decision, the trial court issues minute orders, and Nasiri objects*

On April 11, 2022, Nasiri filed a request for a statement of decision. The request sought the "factual and legal basis" for the court's decision on 32 "principal controverted issues." These included the "[d]etermination of the basis" for not granting Nasiri half of the 2012 and 2013 tax refunds, for finding the community did not have any interest in NCW and TCW, and for the credibility findings regarding Nasiri and Ronis.

On April 21, 2022, the court issued a minute order titled "Court's Response to Request for Statement of Decision." The court "remind[ed] the parties that a request for statement of decision is not a series of interrogatories" and stated that "[m]any of [Nasiri's] requests are difficult or impossible for the Court to respond to."

On May 6, 2022, the court issued a minute order titled "Court's Ruling on Respondent's Request for Statement of Decision." The court stated it had filed a "multi-page, detailed ruling in the case" on April 1, 2022, which was a "final ruling not a tentative decision." The court also stated that in its April 1, 2022 ruling, "as well as in open court, the Court made several comments and findings. Those comments and rulings are to be read in conjunction with this ruling." The court stated Nasiri's request for a statement of decision was "essentially a series of 32 interrogatories" that the court was not obligated to respond to.

The court also elaborated on certain issues. It found that Nasiri was not credible, the evidence at trial did not support her positions, and "[w]hen taken as a whole, the Court weighed the evidence and found that [Nasiri] did not prevail on those areas where she had the burden of proof, and [Abolahrar] did prevail in

12

those areas where he did have the burden." Regarding Nasiri's comments about credibility, the court stated, "[C]ontradicting positions do not necessarily cause the Court to invoke judicial estoppel. In fact, [Nasiri] failed to demonstrate that any Court made any ruling based on the conflicting evidence; only that the conflicting evidence existed." The court identified the numbered items in Nasiri's request for a statement of decision to which it "provided sufficient information in its rulings." The court additionally responded to three of Nasiri's requests.

Nasiri then filed "Objections to the Court's Statement of Decision Entered May 6, 2022" and requested a hearing. Nasiri stated she paid the 2012 and 2013 state and federal taxes that were subsequently refunded solely to Abolahrar. She objected the court had only addressed reimbursement for the 2013 federal tax refund. Nasiri also listed check amounts with corresponding exhibit numbers that she paid from her dental practice to NCW during the parties' marriage, objecting to the court's conclusion that Nasiri had not proven any community property interest in NCW. Nasiri attached her request for a statement of decision with objection numbers listed alongside the numbered requests.

4.    *June 22, 2022 hearing and judgment*

On June 22, 2022, the court held a hearing. Procedurally, the court stated an appeal, as opposed to an objection to the court's rulings, was the appropriate course of action for the parties. The court said the statement of decision would be "appropriately modified" to reflect agreements the parties were able to reach that day, but the court was "not going to go back and redo the statement of decision."

13

At the hearing, Nasiri's counsel raised the issue of the parties' tax refunds. Nasiri's counsel noted the court had addressed the 2013 federal refund but not the 2013 state, 2012 state, and 2012 federal tax refunds. The court stated that, although the returns showed a refund, "[t]hat doesn't necessarily mean that it [was] going to get reimbursed to the community. So I don't know what the evidence was. Because your position–your position assumes that I just blew past it. . . . My position would be that I considered it and didn't award it for a reason. But I don't know what the evidence was, at this time, and I don't have the transcript, so I don't know." Nasiri's counsel stated the evidence showed Nasiri had paid the taxes for those years and "the court even commented, in the middle of trial, that it was community property."

When discussing other issues of reimbursement, the court stated, "[M]aybe the appellate court will do something with this; maybe they won't. I don't know. If there's a stipulation that I got something wrong from the stipulation, that's okay. But I'm not going to go back and relitigate the trial. I did the best I could." Regarding the completeness of the judgment as a whole, Nasiri's attorney agreed "[t]hat the judgment complies with the statement of decision, even though [Nasiri], of course, disagrees with the statement of decision or disagrees with the ruling."

Later the same day, the court entered judgment. Regarding property division, it stated, "Judgment attached per the Court's rulings on Matters Taken Under Submission on March 28, 2022 and ruling of 8/20/19." In July 2022, the court issued a minute order correcting clerical errors in the judgment.

Nasiri timely appealed.

14

## DISCUSSION

### A. *Some Errors in the Statement of Decision Process Prejudiced Nasiri While Others Were Harmless*

Nasiri asserts the trial court's failure to issue a statement of decision upon request "precludes any 'implied findings' beyond the limited findings stated in the court's decisions." We agree the trial court failed to follow the correct procedure for issuing a statement of decision. The court omitted several material issues regarding reimbursement of separate or community property funds, which prejudiced Nasiri. Accordingly, on those issues, we do not infer that the trial court decided in Abolahrar's favor. The court's minute orders issued in lieu of a statement of decision, however, adequately characterized the car washes at the time of marriage. As to those issues, any error in the court's procedure was harmless.

There are several issues in this case on which we reverse and remand. Accordingly, on remand, the trial court shall follow the correct procedure and issue a statement of decision that addresses those issues.

#### 1. *Applicable law and standard of review for statements of decision*

Code of Civil Procedure section 632 provides that, following a trial, the "court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial upon the request of any party appearing at the trial." The trial court "must announce its tentative decision by an oral statement, entered in the minutes, or by a written statement filed with the clerk." (Cal. Rules of

15

Court, rule 3.1590(a).)[3]  The parties have 10 days from the announcement or service of the tentative decision, whichever is later, to request a statement of decision that specifies any controverted issues a party wants the court to address.[4]  (Rule 3.1590(d); Code Civ. Proc., § 632.)  After the court prepares the statement of decision and proposed judgment, the parties may file objections.  (Rule 3.1590(g).)  Only after the court and the parties have followed this procedure, or the parties have waived their right to request a statement of decision or make objections, may the court enter judgment.  (Rule 3.1590(h)-(l).)

“A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness.”  (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.)  Generally, “[u]nder the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision.”  (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 48.)  The appellate court then determines whether substantial evidence supports the implied findings.  (*Ibid.*)

But if a party requests a statement of decision and “the statement of decision does not resolve a controverted issue or is ambiguous, and the omission or ambiguity was brought to the attention of the trial court, ‘it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue.’”  (*Thompson v. Asimos* (2016)

---

[3]      All rule references are to the California Rules of Court.

[4]      Not applicable here, if the trial lasts less than one calendar day or eight hours, the request must be made before the submission of the case for decision.  (Code Civ. Proc., § 632.)

6 Cal.App.5th 970, 981.) Errors in the statement of decision process "are subject to harmless error review." (*F.P. v. Monier* (2017) 3 Cal.5th 1099, 1116.)

### 2. *The trial court failed to follow the correct procedure for issuing a statement of decision*

The trial court failed to follow the statutorily defined procedure for issuing a statement of decision. The court did not issue a tentative decision as required by rule 3.1590(a). Instead, on April 1, 2022, the court issued a "Ruling on Matters Taken Under Submission on March 28, 2022." In the May 6, 2022 minute order and at the June 22, 2022 hearing, the trial court stated the April 1, 2022 ruling was a final, not tentative, order.

Nor did the court issue a single written statement of decision "explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial" as required by Code of Civil Procedure section 632. After Nasiri filed a request for a statement of decision, the court issued two minute orders. The May 6, 2022 minute order stated the court had filed a "multi-page, detailed ruling in the case" on April 1, 2022. But the April 1, 2022 ruling was not a statement of decision because the court had not yet issued a tentative decision, and accordingly Nasiri had not yet filed her request for a statement of decision. Neither can the May 6, 2022 minute order be said to be a statement of decision, as it primarily referred to the findings of the April 1, 2022 order. It also referred to oral "findings and comments" the court made in open court, whereas Code of Civil Procedure section 632 requires a written statement. The court therefore failed to follow the correct procedure.

17

### 3. *Nasiri's record regarding the statement of decision is complete, and her request was timely*

Abolahrar argues Nasiri's record regarding the statement of decision is incomplete because she omitted a minute order from March 28, 2022. Abolahrar argues this court "must assume" the March 28, 2022 order was the court's tentative decision and Nasiri's request for a statement of decision was therefore untimely. The minute order, which Nasiri attaches on reply, is not a tentative decision. It describes routine details from the trial and notes the court took matters under submission. Nasiri's request for a statement of decision, filed 10 days after the court's April 1, 2022 ruling, was timely.

Abolahrar then argues, even if the court did not issue a tentative decision, Nasiri "characterized" the trial court's minute order as a statement of decision. Accordingly, Abolahrar asserts Nasiri's claim on appeal that the trial court did not issue a statement of decision is a "bait and switch tactic" that precludes Nasiri's arguments. We disagree. As discussed, the trial court's procedure was flawed. We do not fault Nasiri for attempting to approximate the process as outlined in the Rules of Court, while also raising on appeal that the process was inadequate.

### 4. *We do not imply findings to uphold the judgment on material issues the court omitted from its rulings*

Some errors in the court's statement of decision process prejudiced Nasiri because they prevent our review of material issues. (See *F.P. v. Monier*, *supra*, 3 Cal.5th at pp. 1114, 1116 [errors in the statement of decision procedure are prejudicial if they prevent the appellate court from effectively reviewing

18

material issues].)  There are issues of reimbursement of separate and community property that the court did not address in the April 1, 2022 ruling; May 6, 2022 minute order; or June 22, 2022 judgment.  We refer to the April 1, 2022 and May 6, 2022 rulings collectively as the minute orders.

Specifically, the court did not address the April 2012, November 2012, and March 2014 checks from Nasiri's dental practice to NCW's landlords; the August 2009, December 2009, and February 2010 checks totaling $88,000 from Nasiri's dental practice to NCW; and the parties' 2012 tax returns.  Earlier in the trial, the court stated the 2012 federal tax refund was community property, but then failed to assign it as either community or separate property.  Similarly, nowhere in the record does the court assign the payments from Nasiri's dental practice to NCW and NCW's landlords.  Thus, "'the reasons for the trial court's decision otherwise disclosed in the record are entirely inadequate to inform this court of the legal bases for the decision.'" (*In re Marriage of Sellers* (2003) 110 Cal.App.4th 1007, 1011.)

Abolahrar argues Nasiri's request for a statement of decision was inadequate because it "posed lengthy, improper objections" as opposed to specifying controverted issues.  We agree the 32 issues in Nasiri's request for a statement of decision went beyond the controverted issues in the case.  Some were also difficult to respond to because they were argumentative or vague. (See *Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 559 [the court need not respond to a request for a statement of decision that posed 32 questions that were purely legal, argumentative, or vague].)  But Nasiri also alerted the court to valid omissions and errors.  As the minute orders did

19

not address material issues, they were inadequate and prejudicial. (See also *Duarte Nursery, Inc. v. California Grape Rootstock Improvement Com.* (2015) 239 Cal.App.4th 1000, 1012 [a statement of decision must "dispose of all basic issues and fairly disclose the court's determination as to ultimate facts and material issues in the case"].)

Further, Nasiri adequately brought the omissions to the court's attention through her request for a statement of decision and objections. Nasiri's request for a statement of decision sought the basis for the trial court's decision not to grant Nasiri half of the 2012 refunds. Nasiri objected the court's minute orders did not address certain payments from her dental practice and the 2012 federal and state tax refunds. Nasiri's counsel again raised the 2012 refunds at the June 22, 2022 hearing and agreed "[t]hat the judgment complies with the statement of decision, even though she, of course, disagrees with the statement of decision or disagrees with the ruling."

Therefore, we do not imply any findings favorable to Abolahrar for issues not adequately addressed in the minute orders.[5] (*Ruiz v. County of San Diego* (2020) 47 Cal.App.5th 504, 521, fn. 11 [not implying favorable findings to the prevailing party on issues omitted from the statement of decision]; Code Civ. Proc., § 634 [where statement of decision does not resolve a controverted issue and it was brought to the attention of the trial court, the court of appeal will not infer "that the trial court

---

[5] Abolahrar asserts even if Nasiri's request for a statement of decision and objections were proper, she fails to explain how the court's decisions regarding the car washes and reimbursement prejudiced her. The potential prejudice is self-evident. The court failed to assign tens of thousands of dollars.

20

decided in favor of the prevailing party as to those facts or on that issue"].)

### 5. *Any errors in the initial characterization of the car washes were harmless*

As to the initial characterization of the car washes, the court's procedural missteps were harmless because the minute orders made clear written findings. (See *F.P. v. Monier, supra*, 3 Cal.5th at pp. 1114, 1116 [errors in the statement of decision procedure are harmless where the failure to make a finding "'could make no possible difference in the result'"].) The trial court found both car washes were jointly purchased before marriage by Abolahrar and Reza and were therefore not community property.[6]

The court's findings regarding the initial characterization of the car washes were also supported by substantial evidence. The court referenced credibility findings to support its determination, primarily that Ronis was a credible witness and that his testimony supported Abolahrar's position. Although

---

[6] Nasiri contests this finding because Abolahrar acquired at least half of NCW after marriage and therefore *he* did not purchase both car washes before marriage. Although the trial court's phrasing could be more direct, it is clear the court was referring to the initial characterization of the property, a "joint venture" between Abolahrar and Reza, and therefore found the two of them purchased both car washes 50/50 before marriage. For the same reason, we disagree with Nasiri's argument that "although the trial court found that NCW was purchased before marriage, it did not make a finding as to *who* made that purchase."

21

Abolahrar's and Reza's testimony was inconsistent at times regarding the ownership of the car washes, the trial court did not need to specify that it was accepting or rejecting certain evidence or the reason for doing so. (See *Estates of Collins & Flowers* (2012) 205 Cal.App.4th 1238, 1254 [statement of decision did not need to explicitly accept or reject evidentiary facts, only state ultimate facts].) The court also found Nasiri "not credible in her testimony" and stated the evidence at trial did not support many of her positions. (See *ibid.* [as long as it does not act arbitrarily, court may reject even uncontradicted testimony of a witness].)

As to the initial characterization of the car washes, therefore, any error in the statement of decision procedure was harmless.[7] (See *Heaps v. Heaps* (2004) 124 Cal.App.4th 286, 292 [procedural issues in the "signing of a proposed statement of decision does not constitute *reversible* error unless actual prejudice is shown"].)

B.    *Nasiri Provides an Adequate Record on Appeal*

Abolahrar argues Nasiri "waived any error" in the trial court because her record on appeal "only contains her own exhibits, very little pleadings, and no trial minute orders." As Abolahrar acknowledges, under California Rules of Court,

---

[7]    As discussed below, the trial court erred in holding NCW was wholly Abolahrar's separate property because he acquired half of it during marriage. Because that is a purely legal issue, we do not address it in the statement of decision context. (See *Estate of Garrett* (2008) 159 Cal.App.4th 831, 840 ["Code of Civil Procedure section 632, concerning statements of decision, applies to the determination of questions of fact, not to questions of law"].)

22

rule 8.124(b)(4), the exhibits admitted into evidence are deemed to be part of the record regardless of whether copies are included in the appendix. Further, under rule 8.124(b)(5), Abolahrar could designate his own appendix, which could "contain any document that could have been included in the appellant's appendix or a joint appendix." While Nasiri's appendix is not as exhaustive as it could be, it is not so deficient as to deprive this court of an adequate record on appeal. Nasiri's record is adequate for us to reach the merits of her arguments.

C.    *Applicable Law and Standard of Review for Property Divisions*

"In a marital dissolution proceeding, a court's characterization of the parties' property—as community property or separate property—determines the division of the property between the spouses." (*In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1399.) Property that a spouse acquired before the marriage is that spouse's separate property. (Fam. Code, § 770, subd. (a)(1).)[8] Property that a spouse acquires during marriage is presumptively community property. (§ 760.) A "spouse may rebut the Family Code section 760 presumption by tracing the source of funds used to acquire the property to separate property." (*In re Brace* (2020) 9 Cal.5th 903, 914; see also *Trenk v. Soheili* (2020) 58 Cal.App.5th 1033, 1048 [Section 760 "does not contain any requirement that the source of funds used to purchase the property must be proved before the presumption applies"].)

---

[8]     Further undesignated statutory references are to the Family Code.

Our review of the trial court's division of property is governed by the deferential abuse of discretion standard. (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 197.) The trial court's findings on the characterization and valuation of assets are factual determinations that are reviewed for substantial evidence. (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887.) In applying the substantial evidence standard of review, "'[o]ur review is limited to a determination whether there is any substantial evidence, contradicted or uncontradicted, that supports the finding. [Citations.] In so reviewing, all conflicts must be resolved in favor of [the prevailing party] and all legitimate and reasonable inferences must be indulged to uphold the finding.'" (*In re Marriage of Brandes* (2015) 239 Cal.App.4th 1461, 1472.)

In determining whether substantial evidence supports the trial court's exercise of its discretion, we do not reweigh the evidence or make determinations as to credibility, because these are matters within the exclusive province of the trial court. (*In re Marriage of Ackerman*, *supra*, 146 Cal.App.4th at p. 204.) To the extent our review of the trial court's division of property turns on the court's interpretation of decisional law, our standard of review is de novo. (*In re Marriage of Ruiz* (2011) 194 Cal.App.4th 348, 353-354.) To the extent "the determination in question amounts to the resolution of a mixed question of law and fact that is predominantly one of law," we examine it de novo. (*In re Marriage of Lehman* (1998) 18 Cal.4th 169, 184.)

D.    *The Trial Court Erred in Finding NCW Was Wholly Abolahrar's Separate Property*

There was substantial evidence to support the trial court's finding that Abolahrar and Reza jointly purchased NCW before Abolahrar and Nasiri's marriage. Because Abolahrar acquired Reza's interest in NCW during marriage, however, part of NCW is presumptively community property. On remand, the trial court must determine whether Abolahrar adequately traced the funds used to purchase Reza's interest in NCW to separate property to rebut the community property presumption.

1.    *Substantial evidence supports the trial court's finding that Abolahrar and Reza jointly purchased NCW before the parties' marriage*

There was substantial evidence to support the trial court's finding that Abolahrar and Reza jointly purchased NCW before the parties' marriage. Abolahrar testified that he and Reza purchased NCW in 2004 from Ronis and submitted evidence of the brothers' payments. Ronis testified he sold NCW to Abolahrar, had "some conversation with his brother, Reza," and "believe[d] they were both involved." The trial court found that Ronis was the only witness "that had absolutely no stake in the outcome of the trial," and that his testimony was consistent with Abolahrar's.

Ronis's testimony, in connection with the other evidence presented, is sufficient to uphold the trial court's finding. (See *Citizens Business Bank v. Gevorgian* (2013) 218 Cal.App.4th 602, 613 [a single witness's testimony may constitute substantial evidence to support a finding].) There are inconsistencies in the record about the initial ownership of both car washes. For

25

example, Abolahrar listed himself and Nasiri as equal owners of NCW on a 2011 loan application and submitted contradictory declarations under penalty of perjury as to TCW's ownership in this case. Reza also previously filed declarations in this case swearing that he was the 100 percent sole owner of both NCW and TCW before testifying at trial that the brothers jointly purchased both car washes.

But the trial court did not need to wholly reject Abolahrar and Reza's position because of contradictions so long as their testimony was not "inherently improbable." (*People v. Holman* (1945) 72 Cal.App.2d 75, 90.) Here, the trial court primarily credited Ronis's testimony, which supported Abolahrar's and Reza's testimony that they jointly purchased NCW before the parties' marriage. (See *In re Sodersten* (2007) 146 Cal.App.4th 1163, 1229 [inconsistencies in testimony do not disqualify a witness; they "'present questions of credibility for resolution by the trier of fact'"].) As it is not our role to reweigh the evidence or to assess credibility, we cannot say the trial court erred in crediting Ronis's testimony and finding the brothers jointly purchased the car washes before marriage. (See *Niko v. Foreman* (2006) 144 Cal.App.4th 344, 365 [appellate courts defer to trial courts' credibility findings].)

2. *Part of NCW was presumptively community property*

Nasiri argues Abolahrar acquired at least half of NCW in 2009 during marriage when the brothers agreed Abolahrar would take over NCW and Reza would take over TCW. Nasiri asserts

26

that portion of NCW,[9] as well as any profits it later generated, was therefore presumptively community property.  The trial court found that because NCW and TCW were purchased before marriage, Abolahrar and Reza could "treat these separate property businesses how they wish, they [could] give them to each other, sell them to each other, or pass money back and forth between them, all without effect on the community."  The court placed the burden on Nasiri to demonstrate a "cogent analysis of a money flow from the community to either business that would have resulted in either a transmutation or a community interest in either asset" and found she had not met that burden.

We agree with Nasiri that NCW 2 was presumptively community property because it was acquired during marriage. (*In re Marriage of Bonds* (2000) 24 Cal.4th 1, 12 [as a general rule, property acquired by spouses during marriage is community property]; § 760.)  It was therefore Abolahrar's burden, not Nasiri's, to rebut the presumption and trace the funds and assets he used to purchase NCW 2 to a separate property source. (See *In re Brace*, *supra*, 9 Cal.5th at p. 914.)

Abolahrar relies on *In re Marriage of Koester* (1999) 73 Cal.App.4th 1032 to argue he did not "acquire" NCW 2 during marriage, but instead merely "exchanged" his separate property interest in TCW into a different form.  The court in *Koester* held that the incorporation of a business during marriage did not change its separate property character solely because of a change in legal form or identity.  (*Id*. at pp. 1037-1038.)  Here, by

---

[9]    For clarity, we will refer to the 50 percent of NCW Abolahrar acquired before the parties' marriage as NCW 1, and to the 50 percent Abolahrar started to acquire from Reza in 2009 as NCW 2.

contrast, there was more "than a mere change in the legal form under which the business was conducted." (*Id.* at p. 1037.) Whereas the business in *Koester* simply changed legal form but maintained the same customers and accounts receivable, the brothers here bought out portions of completely different businesses.

Nor did the brothers exchange business interests of equivalent value. Abolahrar acquired Reza's stake in NCW in part by trading his own interest in TCW. But the transaction was not that simple. The brothers determined NCW was more profitable because they owned it outright, whereas TCW was still encumbered with carryback notes. The brothers also considered that Reza had paid more than $500,000 in victim restitution that resulted from the brothers' criminal convictions. Accordingly, in *addition* to trading his interest in TCW, Abolahrar agreed to pay Reza $5,000 monthly for 10 years and paid TCW's seller two balloon payments of $125,000 and $45,000 on the carryback notes.

Abolahrar acquired a distinct business interest of greater value than he had before, beyond "merely changing its legal form." (*In re Koester*, *supra*, 73 Cal.App.4th at p. 1038.) Because he acquired it during the marriage, NCW 2 was presumably community property. On remand, the trial court must resolve whether Abolahrar rebutted the community property presumption and traced the assets and funds used to purchase NCW 2 to his separate property.[10]

----

[10] At oral argument, Abolahrar argued that even if the community property presumption applied, he rebutted it because the funds he used to buy NCW 2 came from NCW, and were thus separate property income from a separate property business. It

E.   *There Is Substantial Evidence To Support the Trial Court's Finding That TCW Was Not Community Property*

There is substantial evidence to support the court's finding that TCW was not community property.  Nasiri argues the trial court erred because TCW's escrow closed on September 2, 2004, one day after the parties married, and thus TCW was presumptively community property.  The trial court found the date escrow closed was not determinative.  It stated, "The evidence supports that TCW was purchased before marriage.  The fact that escrow closed, and the deed of trust was recorded the day after marriage does not make TCW a community asset."  The court further found that the funds used to purchase TCW "were all acquired before the marriage and would all be separate property."

We do not have to decide whether the date of escrow was determinative or whether TCW was presumptively community or separate property.  Even if TCW was presumptively community

is not that simple.  First, there were other factors that went into the purchase of NCW 2, such as the consideration of the brothers' $500,000 restitution and the three checks totaling $88,000 from Nasiri's dental practice.  Second, because NCW 2 was presumptively community property, there is a question of fact as the character of NCW's income that Abolahrar used to pay the balloon and monthly payments.  Although the "rents, issues, and profits" of a separate property business are separate property (§ 770, subd. (a)(3)), income from a community business is community property (*Beam v. Bank of America* (1971) 6 Cal.3d 12, 18).  It is for the trial court, as the trier of fact, to determine whether Abolahrar sufficiently rebutted the community property presumption.

property, Abolahrar and Reza purchased TCW with separate property cash and loans.  Abolahrar rebutted any community property presumption by tracing the source of funds used to acquire TCW to separate property.  (*In re Brace*, *supra*, 9 Cal.5th at p. 914; see *Trenk v. Soheili*, *supra*, 58 Cal.App.5th at p. 1045 [Section 760 "establishes a presumption affecting the burden of proof, which may be rebutted by the preponderance of the evidence"].)

### 1. *Abolahrar and Reza purchased TCW with separate property cash and loans*

Abolahrar and Reza bought TCW in part with separate property cash.  Abolahrar paid $860,000 of the total $4.2 million purchase price in separate property cash.  He paid $50,000 from his pharmacy business account with a check in March 2004 and wired $810,000 from his personal account in August 2004.  These funds were separate property because the parties did not get married until September 2004, so there were no community funds in March and August 2004.  Reza and his wife also paid part of the balance of the purchase price using their own funds.

The brothers paid for the remainder of TCW's $4.2 million purchase price with separate property loans.  The brothers paid with a $2.1 million loan from Beach Business Bank and two carryback notes of $500,000 and $90,000 from TCW's seller.  Abolahrar was one of several people who guaranteed the bank loan.  The bank loan document was dated August 9, 2004.  Nasiri testified that the loan application was submitted before marriage and that she was not on the loan.  Again, because the community did not exist in August 2004, Abolahrar acquired the loan before marriage and it was therefore separate property.  (See *In re*

*Marriage of Wozniak* (2020) 59 Cal.App.5th 120, 129 ["As a general rule, property that is acquired prior to marriage is the separate property of the acquiring spouse"]; see also § 770, subd. (a)(1).)

Nasiri argues the bank loan was secured by TCW itself and "property purchased with a loan secured by the purchased property itself is ordinarily community property if the transaction occurred during marriage." As Abolahrar notes, "funds procured by the hypothecation of separate property of a spouse are separate property of that spouse." (*In re Marriage of Neal* (1984) 153 Cal.App.3d 117, 125, disapproved on other grounds by *In re Marriage of Buol* (1985) 39 Cal.3d 751, 763, fn. 10, and *In re Marriage of Fabian* (1986) 41 Cal.3d 440, 451, fn. 13.)

Further, Nasiri's contention is true only insofar as it demonstrates the intent of the lender. (See *In re Marriage of Brandes*, *supra*, 239 Cal.App.4th at p. 1484.) The lenders relied solely on Abolahrar's separate property in issuing them. As Abolahrar applied for the bank loan and the bank issued it before the community existed, the bank could not have relied on community property. (See *ibid*. [presumption property acquired on credit during a marriage is community property is rebuttable "'upon a showing that the loan was extended on the faith of existing property belonging to the acquiring spouse'" with direct or circumstantial evidence]; *In re Marriage of Stoner* (1983) 147 Cal.App.3d 858, 864 [same].) Similarly, TCW's seller and Abolahrar agreed on payment terms in March and August 2004 before the parties' marriage. The seller therefore relied on Abolahrar's separate property in issuing the carryback notes. Because the brothers purchased TCW with separate property

cash and loans, it was not community property.  Therefore, the trial court did not err in awarding TCW to Reza.

### 2. *Payments made to acquire NCW do not establish a community interest in TCW*

Nasiri also argues TCW was community property because Abolahrar paid down TCW's loans with cash from NCW.  Nasiri asserts, "payments made from this community source [NCW] demonstrate the community's interest in TCW, as well."  But Abolahrar made the loan payments to *acquire NCW*, not TCW.  The community property presumption applies only to assets that the parties *acquire* during marriage.  (See *See v. See* (1966) 64 Cal.2d 778, 783 [the community property presumption "applies when a husband *purchases property* during the marriage," italics added]; § 760.)  There is no community property right to assets a married couple *disposes of* during the marriage.

Here, Abolahrar sold his interest in TCW to Reza.  In exchange, he acquired Reza's share in NCW.  To buy out Reza's share in NCW, he paid off TCW's loans.  We focus on what the parties *acquired*, not on where they spent the money.  Here, Abolahrar *disposed of* TCW.  In exchange, he *acquired* NCW.  The community property presumption applies to NCW alone. (§ 760 [community property presumption applies only to assets *acquired* during marriage].)

### 3. *Nasiri did not raise any* Van Camp *or* Pereira *argument in the trial court*

Nasiri argues both parties "devoted significant time" to working at TCW and "[a]ny increase in TCW's value during marriage would therefore be largely credited to the community."

Nasiri cites *Pereira v. Pereira* (1909) 156 Cal. 1, 7 in support of this argument.  California courts have "evolved two quite distinct, alternative approaches to allocating earnings between separate and community income" in cases in which a separate property business growth is due to the community's efforts and skill.  (*Beam v. Bank of America*, *supra*, 6 Cal.3d at p. 18.)  One method, first applied in *Pereira*, "'is to allocate a fair return on the [husband's separate property] investment [as separate income] and to allocate any excess to the community property as arising from the husband's efforts.'"  (*Beam*, at p. 18.)  The other approach, first applied in *Van Camp v. Van Camp* (1921) 53 Cal.App. 17, 27-28, "is 'to determine the reasonable value of the husband's services . . . , allocate that amount as community property, and treat the balance as separate property attributable to the normal earnings of the [separate estate].'"  (*Beam*, at p. 18.)

Nasiri failed to raise any *Van Camp* or *Pereira* argument in the trial court.  Nor did Nasiri object to the minute orders on the basis that the court failed to account for an increase in the value of either car wash due to the community's efforts or skill.  Accordingly, she may not now contend that she is entitled to any appreciated value due to community efforts and skill in TCW.  (*City of Rocklin v. Legacy Family Adventures-Rocklin, LLC* (2022) 86 Cal.App.5th 713, 735 [party forfeited argument by failing to raise arguments in trial court].)

F.     *The Trial Court Erred in Miscalculating Nasiri's Obligations to NCW and Failing To Address Issues of Reimbursement*

1.     *The judgment miscalculates Nasiri's reimbursement obligation*

The trial court incorrectly totaled the amount Nasiri is to reimburse to NCW.  The judgment stated Nasiri was ordered to reimburse NCW for (1) $55,244.75 for credit card charges she redirected to her dental practice in 2017, (2) $12,444 for subtenant rent, and (3) $17,342.50 for a check from Fletcher Jones.  The judgment later stated, "Based upon orders of payment from [Nasiri] to NCW as set forth above, [Nasiri] shall pay forthwith to NCW $141,667 as a total sum of the above orders and not as addition to the above orders."  But the only three amounts "set forth above" total $85,031.25.  The judgment therefore overstates Nasiri's obligations by $56,635.75.

Abolahrar contends Nasiri either invited the error herself or forfeited the error.  As Nasiri points out, it was Abolahrar's counsel that requested the court total the amounts Nasiri owed to NCW and provided the miscalculated number.  Nor did Nasiri forfeit the objection by failing to object at the hearing.  Neither the court's April 1, 2022 ruling, nor the May 6, 2022 minute order contained the aggregated $141,667 figure, only the three individual amounts.  Nasiri did not have the opportunity to object in writing.  We do not fault her counsel for failing to catch a miscalculation that Abolahrar's counsel represented was mathematically accurate in the middle of a hearing.

2.      *The court did not account for payments Nasiri made from the dental practice to NCW*

The trial court erred in not addressing payments the community contributed to NCW.  First, Nasiri wrote three checks from her dental practice (which the trial court deemed community property) to NCW's landlords:  $21,534.70 in April 2012, $21,534.70 in November 2012, and $22,180.74 in March 2014, totaling $65,250.14.  Second, Nasiri paid NCW with three checks totaling $88,000 from her dental practice.  Nasiri asserts Abolahrar used the $88,000 to purchase NCW 2 from Reza.[11]  The trial court did not address these payments in its minute orders or in the judgment and, as discussed above, Nasiri adequately objected.  On remand, the court must address these payments.

---

[11]    Abolahrar argues we should disregard these checks because the trial court found Nasiri was not credible.  But it does not appear Abolahrar challenges the authenticity of the three checks.  Abolahrar also argues the checks were not used to purchase NCW 2 because, if they were, they would be written to Reza, not NCW.  But Abolahrar paid the monthly $5,000 payments to Reza and balloon payments towards TCW's loans using funds from NCW's bank account.  Whether the three checks were paid from community assets towards NCW 2's purchase is an issue of fact for the trial court to resolve.

### 3. *The trial court must make factual findings regarding credit card funds Nasiri redirected from NCW to her dental practice*

Nasiri argues the trial court incorrectly ordered Nasiri, instead of the community, to reimburse NCW for $55,244.75 for credit card charges redirected to her dental practice in 2017. Abolahrar argues Nasiri failed to object on this basis below. We agree that Nasiri failed to request a statement of decision or object on this basis below. But given the trial court's error in finding NCW was solely separate property, we remand to the trial court to make further factual findings. On remand, the trial court is to determine whether Nasiri inappropriately redirected funds to the community property dental business in light of the presumption that NCW 2 is community property, taking into account that Nasiri took the funds after separation. The trial court must also determine whether Nasiri or the community is obligated to make any potential reimbursement. (See *Longfellow v. The Presidente Miguel Aleman* (1974) 36 Cal.App.3d 508, 515 [remanding to trial court to make findings of fact and stating "it would be preferable for the appellate court, acting under Code of Civil Procedure section 43, not to supply the missing finding when that can so readily be done by the judge who heard the evidence"].)

### 4. *The trial court did not address the parties' 2012 tax refunds*

The trial court erred in not addressing the 2012 federal and state tax refunds. In the judgment, the court "adopt[ed] the parties' stipulation concerning the tax refund entered in open Court on March 28, 2022" and ordered Abolahrar to pay the

community $66,838.75 for the 2013 federal tax refund. The trial court, however, neglected to address the 2012 federal and state refunds, which were not included in the parties' stipulation, and which Abolahrar received after amending the parties' tax returns after separation.

At the March 28, 2022 hearing, Abolahrar's attorney agreed tax refunds were community property. Specifically, Abolahrar agreed the 2013 federal refund of $66,838.75 was community property, but did not recall getting checks for the 2012 federal refund of $22,891 and 2012 state refund of $13,490. Abolahrar stated the 2012 amounts may have rolled over into the check for the 2013 federal return. The court then moved on to other undisputed issues and did not resolve reimbursement for the 2012 refunds.

We sympathize with the trial court that the evidence was far from clear. For example, on March 28, 2022, Nasiri's attorney specified $22,891 as the amount for the 2012 federal tax refund. But on cross-examination and on appeal, the parties reference a 2012 federal refund of $23,075. Further, Abolahrar testified he received a federal refund of $23,075 as a result of the amendment of the 2012 federal tax return, although he did not recall receiving a separate check for that amount.

Even so, Nasiri submitted evidence regarding the 2012 refunds and adequately objected that the court never assigned them. In her request for a statement of decision, she sought the "[d]etermination of the basis" for not granting Nasiri half of the tax refunds for years 2012 through 2013.[12] Nasiri then objected

---

[12] Nasiri does not address the 2013 state refund on appeal, nor does she submit the parties' 2013 tax returns, entered as exhibits at trial. Accordingly, we address only the 2012 returns.

that she provided evidence "that her earnings were used to pay for such taxes that were subsequently refunded only to [Abolahrar]." Nasiri's counsel again raised this objection at the June 22, 2022 hearing, noting the court gave a credit for one of the tax refunds but not for the other three. The court stated, "My position would be that I considered it and didn't award it for a reason." But at trial, in response to Abolahrar's argument that the refund stemmed from his separate property income from NCW, the court stated, "It's community property." The court did not award the 2012 refunds to Abolahrar. It simply failed to address them altogether, either in the initial ruling, in response to Nasiri's objections, or in the final judgment. On remand, the trial court must assign the 2012 federal and state tax refunds.[13]

## DISPOSITION

The award of TCW to Reza as his separate property is affirmed. The judgment is otherwise reversed.

On remand, the trial court shall comply with the procedures outlined in California Rules of Court, rule 3.1590 and

---

[13] Nasiri requests a new trial in addition to the reversal of the judgment. We disagree that any of the trial court's errors require a new trial. First, a "reversal of the portion of the judgment from which the appeal has been taken has no effect upon the remainder of the judgment." (*In re Marriage of Greaux & Mermin* (2014) 223 Cal.App.4th 1242, 1256.) Nasiri has not identified any evidence she was precluded from introducing below that would necessitate a new trial. The trial court may determine it has sufficient evidence to correct the errors we have identified without hearing any new evidence. We leave that decision to the discretion of the trial court.

Code of Civil Procedure section 632 and issue a statement of decision that addresses the material issues on which we reverse.

The trial court shall make new findings as to the characterization of NCW and Nasiri's $141,667 reimbursement calculation.

The trial court shall also address the following:

(1) the April 2012 $21,534.70, November 2012 $21,534.70, and March 2014 $22,180.74 checks paid from Nasiri's dental practice to NCW's landlords;

(2) the August 2009, December 2009, and February 2010 checks totaling $88,000 paid from Nasiri's dental practice to NCW;

(3) the $55,244.75 credit card payments redirected from NCW to Nasiri's dental practice in 2017; and

(4) the 2012 federal and state tax refunds.

The parties are to bear their own costs on appeal.

RAPHAEL, J.*

We concur:

MARTINEZ, P. J.    SEGAL, J.

---

* Judge of the San Bernardino County Superior Court, assigned by the Chief Justice under article VI, section 6 of the California Constitution.